COMMISSIONER OF BANKS, petitioner, *in re* PRUDENTIAL
TRUST COMPANY.

Suffolk.   November 17, 18, 1921. — March 2, 1922.

Present: RUGG, C. J., BRALEY, CROSBY, CARROLL, & JENNEY, JJ.

*Trust Company*, Savings department, Commercial department.  *Commissioner
of Banks.  Interest.  Equity Pleading and Practice*, Petition by commissioner
of banks, Costs.

The statutory provisions relating to savings departments of trust companies
manifest a legislative purpose to place such departments as nearly as possible
on the same footing of security as savings banks are placed by statute in this
Commonwealth and to overcome so far as practicable the risk from the temp-
tation to officers of embarrassed trust companies to help out any weakness in
the commercial department by resort to the more conservative and secure
assets of the savings departments; and therefore such provisions must be
treated as mandatory and not merely as directory.

The statutory provisions relating to savings departments of trust companies
require restoration to the savings department of the equivalent of any with-
drawals, exchanging of investments or other transactions between it and the
commercial department made contrary to the statutes to the harm of the sav-
ings department and for the apparent or supposed advantage of the com-
mercial department.

Deposits in the savings department of a trust company are presumed to be made
upon the faith of the statutes for their protection.

The depositors in the commercial department of a trust company which also
maintains a savings department must be presumed to have become customers
with knowledge of all preferences established by law for the benefit of the
savings department.

While, in many respects, the relation of a trust company maintaining a savings
department to that department is that of trustee to his *cestui que trust*, and
its relation to its commercial depositors is that of common law debtor to his
creditor, it was not the design of the General Court that the conflicting interests
of the two classes of depositors should be worked out on the theory of tracing
trust funds, where, after the property and business of the trust company have
been taken possession of by the commissioner of banks under G. L. c. 167, § 22,
it is discovered that assets of the savings department had been unlawfully trans-
ferred to the commercial department for no proper equivalent and that their
identity had been lost in part.

If the commissioner of banks, upon taking possession under G. L. c. 167, § 22, of
the property and business of a trust company which maintains a savings depart-
ment, discovers that unlawful transfers have been made by the officers of the
trust company from its savings department to its commercial department, he
must see to it that in the administration of the estate of the trust company all

of the losses suffered by the savings department by reason of these transactions of the officers of the trust company in unlawful transfer of assets of the savings department to the commercial department are made good out of the commercial department so far as the funds of the commercial department will allow.

A decree, entered upon a petition by the commissioner of banks in possession of the property and business of a trust company which had maintained a savings department, directing the commissioner to pay over funds from the commercial department to the savings department because of improper transfers which had been made by its officers from the savings department to the commercial department, should contain no allowance or charge of interest.

In the proceeding above described, it appeared that certain counsel had been requested to prepare a brief and present arguments in behalf of the savings depositors because the individual interests of such depositors were so small as to render it impracticable for any of them to retain counsel in their own behalf; and it was *held* that a proper case under general equity jurisdiction was presented for the allowance of costs as between solicitor and client to be paid out of the funds of the savings department.

PETITION, filed in the Supreme Judicial Court for the county of Suffolk on March 15, 1921, by the commissioner of banks in possession of the property and business of the Prudential Trust Company of Boston, seeking authority to pay to the savings department of that trust company from funds in its commercial department the amount of a transfer of funds and securities from the savings department to the commercial department, and to return to the commercial department certain notes transferred from it to the savings department.

The petition was referred to a master. Findings of the master relating to tracing of funds were as follows:

"Various theories of law were advanced by counsel with regard to the tracing of funds in case the court finally determined that, by virtue of some development of the trust theory, these funds might be traced and restored. I find, in concise form, the following facts for the court's assistance upon that point:

" (a) I find the total amount represented by unpaid balances of notes transferred by the commercial department to the savings department to be $221,882.83.

" (b) I find the total amount given by the savings department to the commercial department, for which uncollected checks of the latter are now held, to be $63,528.03.

" (c) I find the total amount under both (a) and (b) to be $285,410.86.

" (d) I find that the entire amount of $285,410.86 was appro-

priated and used by the commercial department for its own benefit and purposes.

" (e) I find that of this money the sum of $207,782.33 is directly traced into the account of the commercial department in the Fourth Atlantic National Bank.

" (f) I find that $62,628.53 is traced into the funds of the Prudential Trust Company in its banking rooms, and there loses its identity.

" (g) I find that $15,000 never in specie reached the Prudential Trust Company or its bank account. $10,000 was the set-off occurring in the Tremont Trust Company, and $5,000 going to pay a commercial department debt at the Hanover Trust Company.

" (h) I find that up to September 23, 1919, $72,510 of savings department money went into the account of the commercial department in the Fourth Atlantic National Bank. On September 23, 1919, the balance of the commercial department account in that bank dropped to $33,034.09. Between September 23, 1919, and January 23, 1920, $14,728.91 of savings department money went into said account. The next low mark of that account was on January 23, 1920, when it stood at $67,925.19. Between January 23 and August 14, 1920, $105,347.42 went in and the low balance on August 14 was $69,559.97. Between August 14, 1920, and September 10, 1920, $10,000 more went in. The balance of the fund on September 10, 1920, was $131,413.37. It should be noted that more money than is stated above actually was deposited, but I have subtracted from the gross figures the amounts theoretically returned by the payments on transferred notes while in the savings department."

Other material facts found by the master in his report are described in the opinion. The report was confirmed and the case then was reserved by *Pierce*, J., for determination by this court upon the petition, answers, and the master's report.

*J. E. Hannigan*, for the commissioner of banks.

*D. T. O'Connell*, for certain depositors in the commercial department.

*H. R. Bygrave*, for the Prudential Realty Company.

*F. J. Carney*, for certain savings bank depositors.

*H. Williams, Jr.*, by leave of court filed a brief for a commercial depositor in another trust company as *amicus curiae*.

RUGG, C. J. This is a petition by the commissioner of banks in possession of the property and business of the Prudential Trust Company. That company was opened for business in 1915 with both a commercial and a savings department, and continued its operations until closed by the commissioner under the authority of the statutes on September 10, 1920. The purpose of this petition is to secure permission to pay to the savings department of the trust company from funds of the commercial department the unpaid balance of moneys turned over to the commercial department from the savings department in a series of transactions alleged to have been illegal. It is not necessary to pursue the details of these transactions. The separation of the activities of the savings department and of the commercial department of the trust company was never very clearly marked as its business was actually carried on. Separate sets of books were kept. But the business of both departments was carried on in the same banking rooms and the executive officials of both were the same. When the president and treasurer decided for any reason to transfer funds or securities from one department to the other, they could do so immediately without consulting any one. From the beginning of the transactions here in question, on substantially every day the cash and actual reserve in the commercial department was below the amount required by law to be maintained. The commercial department needed money in order to replenish an insufficient reserve of cash which ought to be kept on hand for the purpose of meeting clearing house and counter demands. It was impossible to determine whether this need would be met by increased deposits. Cash and securities were at hand in the savings department, to which recourse was simple. The savings department had cash, notes about to fall due, railroad and government bonds, and railroad and government bonds owned or held as collateral, which could be turned into cash immediately. From time to time notes held in the commercial department were exchanged for cash or securities of the savings department. All these notes were unlawful investments because none of them were approved by the investment committee of the savings department as required by law. Most, if not all of them, also were unlawful because of the nature of the securities or because of an excessive amount loaned to individuals. In some

instances, also, there were placed in the savings department, in return for its cash and securities, treasurer's checks of the trust company, which chiefly were used as temporary vouchers carried as cash items and not collected. It would have been impossible to pay these checks out of the commercial department without serious inconvenience and bringing its cash reserve to a dangerously low level. It was always the plan and purpose not to borrow temporarily and repay in money, but to take from the savings department money or securities instantly convertible into cash and to replace them with notes of borrowers of the commercial department. These were all illegal investments for the savings department. The executive officers of the trust company arranged these transactions for the purpose of maintaining the commercial department in operation as a going concern without regard to the requirements of law established for the security of the savings department and its depositors.

It has been the policy of the Commonwealth from the beginning to establish and maintain savings banks surrounded by all the practical safeguards for the security of their investments and the wise administration of their affairs which could be devised by thoughtful legislation. These have been made more and more stringent from time to time as experience and changes in methods of financial affairs have shown to be desirable. The settled course of legislation has been to invite the scanty savings of the poor, the wages of the laborer and the earnings of the thrifty for deposit in savings banks. They have been under governmental observation and inspection. They have been regarded as proper objects for vigilant watchfulness in order that public confidence might be won and kept unimpaired and the highest practicable degree of security attained. The possible risks of too close relations between savings banks and banks of discount led to the enactment of statutes requiring physical separation between the business rooms of the two classes of institutions and the prohibition of identity of certain executive officers. See G. L. c. 168, §§ 4, 5, and marginal references. When trust companies first were empowered to establish savings departments, attempt was made by legislation to maintain as great security for depositors in such departments as was thought practicable notwithstanding the circumstance that they were conducted by the same corporation

and officers which also carried on the business of general banking for deposit and discount. Among the provisions to that end were requirements that all deposits in savings departments should be "special deposits," that they should all be placed in a separate department to be called a savings department, that all investments should be made in accordance with the law governing savings banks, that such deposits and investments should be appropriated solely to the security and payment of savings deposits and not mingled with other property of the trust company. The capital stock of the trust company, with stockholders' liability thereunder, is held as security for the payment of such deposits, and the depositors in such departments have an equal claim with other creditors on other assets. These provisions of statute manifest a legislative purpose to place savings departments of trust companies as nearly as possible on the same footing of security as savings banks, and to overcome so far as practicable the risk arising from the temptation to officers of embarrassed trust companies to help out any weakness in the commercial department by resort to the more conservative and secure assets of the savings departments. These provisions, having regard to the ends sought to be attained, must be treated as mandatory and not merely as directory. They would fall short of accomplishing their purpose if they are held merely as binding upon the conscience of officers of trust companies. These provisions have the further effect of requiring the restoration to the savings department of the equivalent of any withdrawals, swapping of investments or other transactions between it and the commercial department made contrary to the statutes to the harm of the savings department and for the apparent or supposed advantage of the commercial department. Deposits in the savings department of trust companies are presumed to be made upon the faith of the statutes for their protection. This faith must be kept in the performance as well as in the word of the law. The trust company is a single legal entity. Its departments are established by the statute, but nevertheless it is one corporation. The depositors in the commercial department must be presumed to have become customers with knowledge of all preferences established by law for the benefit of the savings department. In many aspects, the relation of the trust company to its depositors in its savings department

is that of trustee to his *cestui que trust,* and to its commercial depositors that of common law debtor to his creditor. *Kelly* v. *Commissioner of Banks,* 239 Mass. 298.    *Bachrach* v. *Commissioner of Banks,* 239 Mass. 272.    But it was not the design of the General Court that the conflicting interests of the two classes of depositors under the circumstances here disclosed should be worked out on the theory of tracing trust funds.    That would render illusory to a large extent the safeguards apparently held out by the statute for the protection of the depositor in the savings department.    The principles declared and applied in *Little* v. *Chadwick,* 151 Mass. 109, *Lowe* v. *Jones,* 192 Mass. 94, and *Hewitt* v. *Hayes,* 205 Mass. 356, are not pertinent to the facts here disclosed.

The result seems to us to follow from these considerations that, in the administration of the estate of the trust company by the commissioner, all the losses suffered by the savings department by reason of these transactions of the officers of the trust company in transfer of assets of the savings department to the commercial department must be made good out of the commercial department. This decision rests upon the true construction of the statutes. *Commissioner of Banks* v. *Cosmopolitan Trust Co. ante,* 254. Somewhat kindred principles are illustrated by *Peoples National Bank* v. *Mulholland,* 228 Mass. 152, 158, and *Hittinger Fruit Co.* v. *Cambridge,* 218 Mass. 220, 226.

This is not a case where interest should be allowed or charged. There was no agreement concerning the matter.    It is the adjustment of conflicting rights between two sets of depositors in an insolvent trust company.

It follows that the notes and other securities handed over from the commercial department to the savings department should be returned by the latter and that the sum of $285,410.86 should be transferred from the commercial department to the savings department.

It was stated at the bar in substance that counsel had been requested to prepare a brief and present arguments in behalf of the savings depositors because their individual interests were so small as to render it impracticable for any of them to retain counsel in their own behalf.    This presents a proper case under general equity jurisdiction for the allowance of costs as between

solicitor and client to be paid out of the funds of the savings department under the strictly conservative principles laid down in *Frost* v. *Belmont,* 6 Allen, 152, 165.   G. L. c. 167, § 16.   *Sears* v. *Nahant,* 215 Mass. 234, 240.   *Burrage* v. *County of Bristol,* 210 Mass. 299.   Counsel fees may be taxed in the discretion of the single justice.

*Decree accordingly.*