ABRAM YESNER *vs.* COMMISSIONER OF BANKS & another.

Suffolk.    January 21, 1925. — May 21, 1925.

Present: RUGG, C.J., BRALEY, CROSBY, & CARROLL, JJ.

*Trust,* Constructive. *Trust Company. Banks and Banking. Equity Jurisdiction,* To enforce constructive trust.

One who deposited money in a trust company which had many depositors in January and August, 1920, when its officers knew and for some time had known that the company was insolvent and had no reasonable expectation of being able to meet its obligations as they matured, cannot establish a constructive trust as to such deposits in the hands of the commissioner of banks, who took possession of the property and business of the trust company on September 25, 1920, if it appears that such deposits or the proceeds thereof could not be traced further than that they went into the commercial department of the trust company.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on September 17, 1921, against the commissioner of banks and the Cosmopolitan Trust Company, seeking to establish a constructive trust respecting deposits made in the Cosmopolitan Trust Company at a time when it was irretrievably insolvent to the knowledge of its officers.

The suit was referred to a master. The commissioner of banks took possession of the property and business of the Cosmopolitan Trust Company on September 25, 1920. Other material facts found by the master are described in the opinion.

An interlocutory decree confirming the master's report was entered by order of *Pierce,* J.  The suit then was heard by *Wait,* J., by whose order a decree was entered directing the defendant commissioner of banks to pay to the plaintiff $5,000 and costs.  The defendants appealed.

*D. L. Smith,* (*R. W. Nason* with him,) for the defendants.
*S. Brenner,* (*M. M. Horblit* with him,) for the plaintiff.

RUGG, C.J.    This is a suit in equity whereby the plaintiff seeks to establish a constructive trust respecting deposits

made in the Cosmopolitan Trust Company at a time when it was irretrievably insolvent to the knowledge of its officers. The plaintiff made a deposit of $1,000 on January 26, 1920, and another of $4,000 on August 3, 1920, in the trust company, receiving in each instance a certificate of deposit payable to his order in current funds upon surrender of the certificate. The case was referred to a master, whose report states in some detail the methods of business pursued by the trust company. Without narrating those methods, it is enough to say that the trust company continuously for several years made increasingly large loans to corporations and other persons engaged in new and hazardous business enterprises having little or no financial standing and to those promoting highly speculative real estate and other transactions. On January 1, 1920, more than $4,000,000 were due to the trust company from irresponsible borrowers.

Among findings made by the master are the following:— "In connection with its business in 1917, the Cosmopolitan Trust Company had a Christmas Club, the funds of which were payable on December 15, 1917. In that year, the bank had great difficulty in meeting its clearings. Deposits were being withdrawn in a very rapid manner, and these withdrawals continued during the latter part of December and, in January, 1918, settlements for the day's work, we find, [were] delayed until certain sums of money were sent over to the clearing bank to enable the trust company, day by day, to meet its clearings. A similar situation occurred in December, 1918, at which time the bank had still more difficulty in meeting its clearings, which was only accomplished by means of a check on the Irving National Bank, which would take three days to clear. In December, 1918, in order to clear its checks, the entire gold reserve of the bank, amounting to $40,000, was forwarded to the First National Bank before the latter would agree to clear checks for the trust company. The withdrawals greatly exceeded the deposits, and this continued late in January of 1919. In 1919 and 1920, deposits increased, and the foreign department of the trust company showed large profits, but during that year the Cosmopolitan Trust Company had difficulty in meeting

its clearings.  I accordingly find that notwithstanding the possibility of return from these borrowers, which must have been a most remote and uncertain expectation, that at each of the times when money was received from the plaintiff, the bank was insolvent to the knowledge of Max Mitchell, its president.  In view of the complete control and intimate relation of the president of the bank with these borrowers, who were merely his pliant instruments or his creatures, I am impelled to find that at the time of the receipt of the several sums from the plaintiff, the situation of the bank was not merely that of simple insolvency but one in which there was no reasonable expectation of its ability to meet its obligations when demanded by its depositors and would, in that event, be obliged to suspend its ordinary operations. . . . The course of the remarkable transactions above outlined does indicate a reckless attempt to recoup other losses previously arising out of incautious loans and may not be inconsistent with the existence of a mere slender hope that extraordinary good fortune might result in the rehabilitation of the bank.  Therefore I find that on the several days when the plaintiff purchased the certificates of deposit, the officers of the bank had no reasonable  expectation of its being able to meet its obligations as they matured."

The master also found that the deposits of the plaintiff or the proceeds thereof could not be traced further than that they went into the commercial department of the trust company.

It may be doubtful whether these findings amount to a decision that the officers of the trust company, although knowing of its insolvent condition, were without genuine and reasonable hope, expectation and intention to carry on its business and to recover sound financial standing.  See *Steele* v. *Commissioner of Banks in re Prudential Trust Co.* 240 Mass. 394, 397.  It is not necessary to pass upon that point because, for another reason, the plaintiff cannot recover.

It was said in *Little* v. *Chadwick*, 151 Mass. 109, 110, "When trust money becomes so mixed up with the trustee's individual funds that it is impossible to trace and identify it as entering into some specific property, the trust ceases.

The court will go as far as it can in thus tracing and following trust money; but when, as a matter of fact, it cannot be traced, the equitable right of the *cestui que trust* to follow it fails." In *Lowe* v. *Jones*, 192 Mass. 94, at page 101 are found these words: " . . . by the great weight of authority, a trust cannot be established against the proceeds of trust property which has been disposed of, unless the proceeds can be identified and traced into some specific fund or property. . . . The rule in Massachusetts has always been held, with considerable strictness, to require the identification of the trust property as passing into some other specific property or fund, as distinguished from the general assets of one's estate." This rule was reiterated in *Hewitt* v. *Hayes*, 205 Mass. 356, 361, 362, and applied against the existence of a trust in *Old Colony Trust Co.* v. *Puritan Motors Corp.* 244 Mass. 259.

It seems fairly inferable from all the facts set out in the master's report that, from one angle of approach, every deposit received by the trust company during a long period of time before the commissioner took possession of its property and business, was accepted fraudulently because it was in truth insolvent and not in a condition to pay the depositors in ordinary course. The devices adopted by it to secure the clearing of the checks of its depositors show the straits to which it was put. Its entire gold reserve was used at one time to tide it along. In view of the exigencies constantly confronting the trust company in the last months of its doing business, it cannot be thought that any particular sum of money was kept in any special fund. It is a fiction established by equity in order to work out justice to assume that in the fluctuations of a fund made up partly of money obtained by fraud and partly of money belonging to a wrongdoer, the latter's purpose is to draw out his own rather than the other's money, and that therefore the person defrauded can assert a lien on what remains. It would be pressing that fiction to an absurd extent to follow it in the circumstances disclosed on this record. Every equity in favor of this plaintiff would probably be found to exist in favor of every other ordinary depositor in the trust company during the period covered by the master's investigations. The present

plaintiff shows no equity in his favor superior to that of great numbers of other ordinary depositors, who have suffered through the unsound banking methods of the trust company. The reasoning and conclusion in *Cunningham* v. *Brown,* 265 U. S. 1, 12, 13, although relating to different facts and to proceedings in bankruptcy, are pertinent to the conditions revealed on the present record. Referring to the rule here invoked by the plaintiff, it there was said at page 13: "The rule is useful to work out equity between a wrongdoer and a victim; but when the fund with which the wrongdoer is dealing is wholly made up of the fruits of the frauds perpetrated against a myriad of victims, the case is different." Without saying that each of these words is apt to describe the case at bar, the principle thus stated is relevant. It is controlling of the case at bar.

It was said in *Central Trust Co. of Illinois* v. *Hanover Trust Co.* 242 Mass. 265, 268, 269: "It should be added that the right to preferential payments should not be implied or extended in cases arising under this statute, one purpose of which is to ensure prompt liquidation in favor of the numerous depositors in the savings and commercial departments of trust companies. G. L. c. 167, §§ 22–36." Several cases illustrate that principle where the court has found inapplicable the theory of tracing trust funds followed in *Hewitt* v. *Hayes,* 205 Mass. 356. *Commissioner of Banks* v. *Cosmopolitan Trust Co.* 240 Mass. 254, 259. *Commissioner of Banks, petitioner, in re Prudential Trust Co.* 240 Mass. 478, 484. *Hecker-Jones-Jewell Milling Co.* v. *Cosmopolitan Trust Co.* 242 Mass. 181, 188. The trust company is hopelessly insolvent. Its assets are not sufficient to pay in full its depositors either in the savings department or in the commercial department. In substance and effect this is an attempt by one depositor to secure a preference over other creditors, and to get payment in full at the expense of other creditors. There is no equity which warrants such a preference in all the circumstances.

The finding of the master is categorical to the effect that he cannot trace the deposits of the plaintiff into any particular fund. That finding is supported by the inferences from

other facts found.    That finding brings the case at bar within the statement of the rule prevailing in this Commonwealth as stated in *Lowe* v. *Jones*, 192 Mass. 94, and in the cases there reviewed and in the later cases following it.    The circumstance that a trust company deals in cash and credits does not distinguish the case at bar from *Lowe* v. *Jones* and like authorities, or bring it under a different classification, for reasons already stated.    That finding also distinguishes the case at bar from *In re Hallett's Estate*, 13 Ch. Div. 696, and other decisions upon which the plaintiff relies.

The case at bar may be distinguishable from *Allen* v. *United States*, 285 Fed. Rep. 678, in that the trust company was not authorized by law to receive the deposit there in question.    However, whether all decisions can be distinguished or whether there is some conflict in the authorities, we are clear as to the result to be reached on the facts of the present record.

It follows that the plaintiff cannot recover.    The decree is reversed and a decree is to be entered dismissing the bill.

*So ordered.*