# DECISIONS

OF THE

# SUPREME JUDICIAL COURT

OF

## MASSACHUSETTS

---

MEDFORD TRUST COMPANY *vs.* EDWIN T. McKNIGHT & others.

Suffolk. December 6, 7, 13, 1933. — September 12, 1935.

Present: CROSBY, FIELD, DONAHUE, & LUMMUS, JJ.

*Trust Company*, Officers and agents, Investments, Loans, Dividends, Savings department, Ultra vires. *Negligence*, Of director. *Proximate Cause. Damages*, For breach of contract. *Interest. Equity Pleading and Practice*, Premature suit.

Persons who were directors of a trust company and members of the investment committee of its savings department but not members of a finance committee chosen "to supervise all the financial transactions of the Company" were liable to it on the ground of negligence for losses resulting from their approving, without inquiry, though in good faith, unsound loans in both departments authorized by the finance committee, where in the circumstances they could and should have ascertained by inquiry that the finance committee's investigation of loans was inadequate, or where they knew or should have known that they could no longer rely on the judgment of the finance committee of the value of real estate taken as security or of the quality of the loans; and directors and members of the investment committee who were members of the finance committee were also liable for losses due to their negligence in making unsound or improper loans.

Directors of a trust company were liable to it, in the circumstances, for losses resulting from its purchase of the stock of a corporation whose sole asset was the equity of real estate upon which the trust company

held a mortgage, where the direct purchase of the equity by it would have been illegal.

Loans by the savings department of a trust company upon a pledge of a second mortgage of real estate are *ultra vires*, even if the company holds the first mortgage; and members of its investment committee who approve such loans are liable to it for resulting losses.

A director of a trust company who negligently approved a loan, unsound when made, was liable for the entire resulting loss though due partly to causes intervening after his ceasing to be a director.

A director of a trust company was liable to it by reason of a personal advantage derived by him from a loan by it in violation of his duty as a director, unless he proved that it suffered no loss thereby.

G. L. (Ter. Ed.) c. 172, § 40, forbidding loans by a trust company to one person in excess of a certain percentage of its capital and surplus, does not apply to loans made in its savings department either alone or in combination with loans made in its commercial department.

The approval by a director of a trust company of an additional loan to a debtor in its commercial department whereby the total debt exceeds the limit prescribed by G. L. (Ter. Ed.) c. 172, § 40, if given in good faith without negligence in not knowing of the excess, imposes no liability upon the director.

G. L. (Ter. Ed.) c. 172, § 80, forbidding the declaration of certain dividends by a trust company, does not apply to dividends upon deposits in its savings department.

Directors of a trust company who declare an excessive dividend upon deposits in its savings department, relying honestly and without negligence upon the examinations and reports required by G. L. (Ter. Ed.) c. 172, § 68, are not liable for the excess.

In a suit in equity to enforce the liability of directors of a trust company for an improper loan, each defendant's liability is for the sum actually lent (excluding a bonus promised but not paid by the borrower), plus incidental expenses, less payments of principal made by the borrower upon the loan, liquidated salvage, and the value of unliquidated salvage computed as of a date not later than the final decree; with interest on the sum wrongfully diverted at the legal rate from the time the loan was made to the times of collections of principal or to the date of the final decree on uncollected portions, excepting periods for which interest has been received in accordance with the borrower's note.

A suit in equity against a director of a trust company for loss incurred through his breach of duty is not premature though brought before the extent of the loss has been ascertained.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on December 29, 1931.

The interlocutory decree described in the opinion was entered by *Crosby*, J., and the reservation and report was by *Lummus*, J.

*C. S. Walkup, Jr.,* (*L. G. Brooks* with him,) for the defendant Alden W. Teel.

*C. B. Rugg,* (*F. W. Crocker & W. F. Farr* with him,) for the defendants John Coulson and another.

*A. B. Nelson,* for the defendant Clifford M. Brewer.

*S. H. Lewis,* for the defendants Walter F. Cushing and others, submitted briefs.

*A. C. Walton,* for the defendant John E. Volpe, submitted a brief.

*A. E. Lewis,* for Catherine A. Dennison, executrix, submitted a brief.

*W. I. Nottage,* for the defendant William N. Curtis, and *G. B. Hayward & J. H. Powers,* for the defendants Ernest B. Moore and another, submitted a brief.

*R. T. Bushnell,* (*J. G. Bryer & J. Lewiton* with him,) for the plaintiff.

FIELD, J. The Medford Trust Company was incorporated under the laws of this Commonwealth in 1908. On October 7, 1931, the commissioner of banks took possession of its property and business.

This suit in equity was brought in this court by the Medford Trust Company, hereinafter referred to as the bank or the trust company, in possession of the commissioner of banks, against twenty-five persons, who, at the time the commissioner took possession, were or had been directors of the bank, to establish and enforce liability against the defendants for losses alleged to have been caused by their improper conduct as directors. The names of the defendants and the periods during which they were directors of the bank are set forth in the margin.* An

---

* Charles H. Barnes, Clifford M. Brewer, John Coulson, senior, John Coulson, junior, Andrew F. Curtin, William N. Curtis, Walter F. Cushing, William J. Daly, James T. Dennison, Alfred F. DeScenza, John E. Eaton, senior, John E. Eaton, junior, Frank W. Lovering, Lewis H. Lovering, Edwin T. McKnight, Ernest B. Moore, Harry C. O'Brien, Louis E. Page, Abel S. Price, E. Waldo Reed, Charles H. Sawyer, Alden W. Teel, Henry P. Van deBogart, John E. Volpe, Frederick B. Walker. All were directors from some time prior to the period in question until the closing of the bank except the following: Barnes was a director from January, 1931, until the bank closed; Brewer, from the time the bank was organized until June 17, 1930; Coulson, senior, from the time the bank was organized until July 22, 1930;

interlocutory decree was entered denying motions to recommit the report, overruling objections, treated as exceptions, thereto, denying requests for a report of the evidence and requests for rulings, and confirming the report. Thereafter a single justice reserved and reported "all questions of law and fact appearing on the record in this cause for the consideration of the full Court." The evidence before the master is not reported.

The plaintiff makes the following contentions: (a) "that the defendants were negligent in making or approving a large number of loans from 1926 to the closing of the bank"; (b) "that the defendants made or approved certain groups of loans in violation of the statute forbidding a trust company to loan more than a stated percentage of its capital and surplus to a single borrower"; (c) "that certain of the defendants received illegal personal profits by virtue of certain loans made by the bank"; (d) "that on several occasions dividends in the Savings Department were declared by the defendants in violation of the law, since interest not earned and bonuses not collected were included in ascertaining the amount of apparent earnings from which dividends were declared"; and (e) "that the plaintiff has suffered substantial losses as a result of the conduct above summarized." Defendants, in addition to other contentions, make the contentions, (f) that the suit was brought prematurely, and (g) that there were errors in the admission or exclusion of evidence.

Since the evidence is not reported "the findings of the master must be accepted as true unless they are mutually

---

Coulson, junior, from January, 1929, until January, 1930; as to Curtin there is no specific finding; Teel, from April, 1926, until the closing of the bank; DeScenza and Walker, from July 27, 1927, until the closing of the bank; Eaton, senior, Eaton, junior, O'Brien, Van deBogart, from January, 1929, until the closing of the bank; Volpe, from July 22, 1930, until the closing of the bank.

Curtin died after the suit was brought, but his estate did not intervene and was not a party defendant. Dennison died after the suit was brought and the executrix of his estate intervened and became a party defendant. McKnight and Eaton, senior, each filed a voluntary petition in bankruptcy and the trustee of each estate was made a party defendant. After the entry of an interlocutory decree the defendant Eaton, senior, filed a suggestion of discharge in bankruptcy with a certified copy of the original certificate of discharge on July 18, 1933.

inconsistent or contradictory and plainly wrong." *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 139.

The plaintiff had both a commercial and a savings department. The standard of duty for directors of such a trust company has been stated recently in these terms: "Directors are bound to exercise ordinary prudence and skill to care for and invest the money entrusted to the bank, in accordance with its charter and the governing statutes. They must be animated by the utmost good faith. They hold themselves out as having the superintendence and management of all the concerns of the bank. They thereby engage to conduct its business as men of reasonable ability, necessary intelligence and sound judgment ought to conduct it. They must be diligent in ascertaining and in keeping informed as to the condition of its affairs; they must to a reasonable extent control and supervise its executive officers and agents; they must display understanding and insight proportionate to the particular circumstances under which they act. They need not exhibit greater wisdom and foresight than may be fairly expected of the ordinary man in similar conditions. They invite the confidence of the depositing public and must afford the protection thereby implied. They are not bound to give continuous attention to the business of the bank; they are bound only to be present, so far as rationally practicable, at stated meetings of the board and of its committees. They are not required to be expert accountants or familiar with the details of bookkeeping or to know everything disclosed by the books of the bank. Having regard to the nature and extent of the affairs of the bank and the customs of banking, directors are justified in committing the conduct of the main business to officers and subordinates and, in the absence of grounds for distrust, to assume that such persons will be upright in the performance of their duties. They are entitled to rely upon the information and advice given them by executive officers whose probity and competency are not under just suspicion, but they cannot surrender to them the responsibilities resting on directors. They are liable for negligence in the per-

formance of those responsibilities even though they have acted in good faith. Impracticable obligations are not imposed on them. But they must direct and not be led. They must heed warnings from responsible sources. They must do something to see that statutes established for the protection of depositors are observed and followed. Each individual director is liable only for the results of his own misconduct although such results may be magnified in some instances by the concurring misconduct of other directors. For errors of judgment while acting with integrity, 'skill and prudence, measured according to the demands of the duties or business which they have taken upon themselves, they are not to be held liable; but they cannot excuse themselves from the consequences of their misconduct or of their ignorance or negligence by averring that they have failed merely to exercise ordinary skill, care and vigilance.' 'In other words,' such directors 'are held to the same duty as ordinary trustees of a direct trust.'" *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 137–138. See also *Cosmopolitan Trust Co.* v. *Mitchell*, 242 Mass. 95, 118–120. The bank is entitled to recover from such directors the amounts of money lost by it through their breaches of duty as directors. *Greenfield Savings Bank* v. *Abercrombie*, 211 Mass. 252, 259. *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 157. For reasons which appear later it is unnecessary to consider whether recovery in a suit like the present suit is limited to an aggregate amount sufficient to liquidate the unpaid obligations of the bank. Compare *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 157.

The master made the following general findings: The by-laws of the bank provided that the directors should choose a finance committee of their own members and that this finance committee should "supervise all the financial transactions of the Company and . . . have authority to act concerning the same, and give such direction to the officers in regard thereto as the interests of the Company from time to time seem to them to require, except when otherwise provided in these by-laws or by vote of the Directors." Prior to January, 1928, the finance committee consisted

of the directors McKnight, Coulson, senior, and Lewis H. Lovering. On January 24, 1928, the defendants Frank W. Lovering and Daly were added to the committee, and on July 22, 1930, the defendant Coulson resigned and was succeeded by the defendant Teel. The investment committee of the savings department consisted of the entire board of directors with the exception of the defendant Dennison. See G. L. (Ter. Ed.) c. 172, § 60.

"Some members of the finance committee were present at the bank every day and the committee met regularly about twice a week. The board of directors and the investment committee of the savings department met regularly twice a month, except in the summer when the meetings were usually monthly. All members of the board of directors were faithful in attendance at meetings. Except in case of illness no director was absent for more than a few meetings a year. . . . The meetings of the directors and the investment committee were held following one another, the exact order varying at different periods, but the meetings were distinct and independent. Although the defendant, Dennison, was sometimes present at the meetings of the investment committee, he took no part in them. Down to the summer of 1931 no records were kept of the meetings of the finance committee except in one or two instances. Members of the finance committee testified without contradiction that no loan was passed by that committee if any of its members opposed. No attendance records were kept, however, and except where mortgage applications in writing were approved, there is no evidence (except in special instances) as to which members of the finance committee approved any particular loan before June 1931.

"When loans were approved by the finance committee a memorandum to that effect was given to the proper officer of the commercial department or savings department, as the case might be. The loan was then entered on the 'Discount Register' of the proper department. It was the general custom for the finance committee to authorize real estate loans and for the loans to be made by the bank on such authorization without waiting for a vote of approval by

the board of directors or investment committee. This fact was known to all the directors. The wisdom of such conduct had been discussed from time to time but the entire board acquiesced in the practice. I find, however, that this practice had no effect on the loans involved in this case. In every instance where a loan here involved was made by authority of the finance committee it was approved by the board of directors or the investment committee, as the case might be, and in no case was this approval due to the fact that the loan had already been made and that the bank might be embarrassed if the action of the finance committee was not approved. In each case the loan was approved on its supposed merits by the board of directors or the investment committee, as the case might be, without reference to the fact that the bank might be committed to the loan or that money had already been advanced upon it.

"The treasurer of the bank was clerk of the board of directors and of the investment committee. He recorded all votes passed at the meetings and also recorded the name of each director who voted in the negative on any motion adopted. Negative votes were rare and there were none on any of the matters involved in this case. I find that in all matters here involved every defendant who was present at a meeting of the directors or of the investment committee, as the case might be, at which such matter was acted upon, either voted in favor or acquiesced by failing to vote in opposition. At the meetings of the board of directors and meetings of the investment committee, it was the practice for someone to read the list of loans which were up for action, including in this list loans which would become due before the succeeding meeting. On each loan the name of the borrower was read and the amount, term, rate and security. When a bonus was involved that information was given. Originally the list was read by the treasurer, but at the suggestion of the bank commissioner this practice was changed and in more recent times the list was read by some member of the board. The directors would ask such questions as they desired with reference to any of the loans and at times there was considerable discus-

sion as to some particular loan.  Questions relating to loans involving real estate were generally answered by the president [Edwin T. McKnight] or some other member of the finance committee.  Questions relating to the value of securities were answered by the president, treasurer, or by Coulson or Brewer.  During the period in question, 1926 through 1931, the meetings started at 7:30 P.M. and, including the directors' meeting and the meeting of the investment committee, lasted on an average until 9 or a little after.  In the commercial department one hundred or more loans were frequently acted upon, a considerable number of them being renewals, but in the savings department the number rarely exceeded ten.  The testimony with reference to exactly what discussion if any, took place at the meetings when the specific loans in controversy were acted upon is vague and contradictory.  The meetings in question in many instances had been held many years before the hearings and in no case is it possible to make a finding of just what information was asked from or given by the finance committee with reference to any of the original loans at the time they were acted upon.  In many cases, considering the length of the meeting and number of matters acted upon, it is evident that slight consideration could have been given to any single loan."

As to all the defendants whose conduct is in question in this suit, except Barnes, Eaton, Eaton, junior, Frank W. Lovering and McKnight, and Cushing in certain specific cases where he made a personal profit, the master found in substance that they acted in good faith.

The master made other general findings and also findings with respect to specific transactions and individual directors.

First.  We consider first the instances in which the plaintiff contends that the several defendants are liable for negligence in making or approving loans.

The master's report contains a summary in the case of each defendant of loans or groups of loans classified as "real estate loans" with respect to which the master found that such defendant is, or, on some view of the law, may be, liable for losses resulting from making or approving such

loans. Questions concerning liability are here considered; questions concerning damages are considered later in this opinion.

The plaintiff makes no contention on this branch of the case that there is liability on any director for loss resulting from any loan not so summarized. In the aggregate there are thirty loans or groups of loans so summarized.* In two instances, the transactions included in the summary of "real estate loans" are not loans but are governed by similar principles. Of these thirty loans or groups of loans ground for liability of a director not a member of the finance committee — except in two instances of personal profit by the defendant Cushing hereinafter considered — is found in only fourteen instances.

All findings of grounds for liability resulting from the making or approving of loans are based upon the participation of a specific director in making or approving a loan, at least to the extent of his being present at a meeting of the board of directors or the investment committee at which action was taken and acquiescing in such action by not voting in opposition thereto. In the absence of proof that a director present at such a meeting opposed action then taken, he is to be regarded as having assented thereto. *Cunningham* v. *Commissioner of Banks*, 249 Mass. 401, 429. In some instances, however, for special reasons, the master has not found a director, present at a meeting at which action was taken, liable on account of such action. In these instances the plaintiff does not contend that such director is liable for loss resulting from such action. None of the findings of negligence or other ground for liability is based on

---

* Lot 141, Ravenna Road; Lot 142, Ravenna Road; Lot 25, Cerdan Avenue; 820–822 Massachusetts Avenue, Arlington; Haverhill; Royall Holding Corporation; Lot 57, Burnside Avenue; West Springfield Theatre; 400 Blue Hills Parkway; Hotel Dunbar; 353–357 Washington Avenue, Chelsea; Lot B, Salem Street; Lots A and B, Ellington Street on Salem Street Realty Co. Transaction; Salem Street Realty Co.; Lot A, Ellington Street, first mortgage; High and Winthrop Streets; Lot A, Fellsway — first mortgage; Lot A, Fellsway — collateral loan on second mortgage; Lot A, Fellsway — collateral loan on second mortgage; Hancock Street — first mortgage; Hancock Street — second mortgage, Cushing; Hancock Street — second mortgage, building completion; Warren Street, Brighton; Mechanic Street, Leominster; Tragia Theatre; 996 Farrington Street; 997 Farrington Street; Griffin; Greenlay Land; Greenlay Apartments.

failure of a director to attend meetings of the board of directors or of the investment committee. All were faithful in attendance at such meetings. Compare *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 137. The findings basing actual or possible liability on participation in making or approving loans are in accord with the principle stated in *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 138, that each "individual director is liable only for the results of his own misconduct although such results may be magnified in some instances by the concurring misconduct of other directors."

In some instances the effect of breach of specific statutory requirements is involved either as bearing on liability for negligence or independent of negligence. Among the statutes significant on this branch of the case are the following: G. L. (Ter. Ed.) c. 172, § 61, provides that deposits in the savings department of a trust company "shall be special deposits . . . and all loans or investments thereof shall be made in accordance with the law governing the investment of deposits in savings banks." G. L. (Ter. Ed.) c. 168, § 54, provides that deposits in savings banks and the income derived therefrom shall be invested only in certain securities thereinafter described in the section. Clause First of this section authorizes investment "In first mortgages of real estate located in the commonwealth not exceeding sixty per cent of the value of such real estate; but not more than seventy per cent of the whole amount of deposits shall be so invested," and provides as follows: "If a loan is made on unimproved and unproductive real estate, the amount loaned thereon shall not exceed forty per cent of the value of such real estate. No loan on mortgage shall be made except upon written application showing the date, name of applicant, amount asked for and security offered, nor except upon the report of not less than two members of the board of investment who shall certify on said application, according to their best judgment, the value of the premises to be mortgaged; and such application shall be filed and preserved with the records of the corporation." Clause Ninth (e) (1) authorizes investment in "A note of

a responsible borrower in such form as the commissioner may approve, with a pledge as collateral of" first mortgages of real estate such as are referred to in clause First provided the values of the properties have been certified as therein required and the assignment of each of said mortgages is recorded in the proper registry of deeds. G. L. (Ter. Ed.) c. 266, § 53A, imposes a penalty upon a director of a "bank" — a word which by statutory definition includes a trust company, G. L. (Ter. Ed.) c. 167, § 1 — "who knowingly receives or accepts for such bank any fictitious, valueless, inadequate or irresponsible obligation directly or as security or endorsement unless the consideration or security is otherwise sufficient, or unless it shall be necessary to prevent loss upon a debt previously contracted in good faith." The effect of G. L. (Ter. Ed.) c. 172, § 40, is considered later in this opinion.

The master states in his report that in arriving at his conclusions he has taken the following points into consideration: "In considering these loans and the value of the security on which they were made and the question of whether the several defendants used due care, it must be borne in mind that most of the loans criticised were made during the years 1926–1928 when public sentiment was optimistic and before the present depression began and fairness to the defendants demands that the problems be approached with that in mind. The real estate market reached its peak about 1925 and since 1928 real estate values have been declining. Furthermore, real estate values are so largely a matter of personal opinion that it is evident that in the case of loans in the savings department there must be a considerable variation between sixty per cent of the figure the master finds to be the fair value and the amount of the loan recommended before it can be said that the members of the committee or board making the loan were wanting in due care on that particular ground. It is also evident that at certain times, in certain places and in certain types of property what constitutes a reasonable variation may be greater than in other instances, so that no arbitrary rule or definite percentage can be adopted. Cer-

tain of the construction loans present further questions. While the value and marketability of a completed building may justify a loan regardless of the financial resources or character of the borrower, it is evident that in the case of a construction loan the financial ability and determination of the borrower to complete the building are of vital importance if the bank is not to be faced with the alternative of having a half completed building on its hands or of lending the borrower the additional money needed to complete it."

For the purpose of dealing with the liability of directors in making or approving loans we separate them into two groups: (a) directors not members of the finance committee and (b) members of the finance committee.

1. Directors not members of the finance committee.

Fourteen loans or groups of loans are involved.* Grounds of liability for the approval of loans by directors not members of the finance committee in the case of loans by the savings department rest on the approval of such loans by the investment committee, and in the case of loans by the commercial department on the approval of such loans by the directors as such. The master has found no grounds for liability for the approval of loans by any director not a member of the finance committee prior to the meetings of the investment committee and of the board of directors on December 13, 1927, and has found in substance that up to that time these directors were justified in relying on the recommendations of the finance committee.

The master found expressly, however, that beginning with the meetings on December 13, 1927, in each of eleven instances some of the directors not members of the finance committee were negligent in approving a loan or loans included in the fourteen loans or groups of loans here in

---

* Main Street, Haverhill; Royall Holding Corporation, Haverhill; West Springfield Theatre; Salem Street Realty Co.; High and Winthrop streets; Lot A, Fellsway — first mortgage; Lot A, Fellsway — collateral loan on second mortgage; Lot A, Fellsway — collateral loan on second mortgage; Hancock Street, Quincy — first mortgage; Hancock Street, Quincy — second mortgage building; Warren Street, Brighton; Tragia Theatre, Leominster; 996 Farrington Street, Quincy; Greenlay Apartments. When not otherwise specified the real estate was in Medford.

question. And in several instances the master found that where a loan was approved negligently the loss resulting from a later loan in the same group was a consequence of the original negligence and that a director who approved both the earlier and the later loans was also liable for loss resulting from the later loan. In general these findings are based on all the evidence and not solely on the subsidiary findings. They are not inconsistent with the subsidiary findings or plainly wrong. And wherever the finding of negligence purports to be based on subsidiary findings the ultimate finding is amply supported.

In each of these groups of loans, according to facts found by the master, one or more loans were improper when made and have resulted in loss to the bank or to the savings department thereof. Most of the loans were made on first mortgages of real estate by the savings department. Each such loan on the basis of value of the mortgaged property, as found by the master, was in excess of the amount which, under G. L. (Ter. Ed.) c. 168, § 54, cl. First, legally could be loaned, though in most instances the loan was not in violation of that statute on the basis of the values certified thereunder. And according to the values of real estate securing loans of the commercial department, as found by the master, the loans by the commercial department were excessive in amount. In each instance loss has resulted, based upon the value of the mortgaged property at the time the bank was closed or at the time of the hearing before the master. The values found by the master for real estate are not inconsistent with other findings or plainly wrong.

Many of the loans in question were large construction loans. At a meeting of the investment committee on December 13, 1927, a construction loan by the savings department secured by a first mortgage on real estate — the West Springfield Theatre — was approved. According to the subsidiary findings the nature of this loan, the location of the mortgaged real estate and the recent experience of the bank with a somewhat similar construction loan should have put the investment committee on inquiry as to the adequacy of the investigation made by the finance com-

mittee (see *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 143), and such inquiry would have disclosed that no adequate investigation was made. The finding of negligence under these conditions, based on "all the evidence," is not inconsistent with the facts disclosed by the report showing that the investment committee was at that time entitled to rely to some extent on the recommendations of the finance committee.

In 1928 began a group of loans on the Tragia Theatre in Leominster. A large construction loan on first mortgage of real estate by the savings department and a loan on second mortgage of the same real estate by the commercial department were approved at the meetings of the investment committee and of the directors respectively. As in the case of the loan previously discussed there are facts found showing that the members of the investment committee, acting as such or as directors, should have made inquiry as to the adequacy of the investigation of the finance committee — which as found was in fact inadequate — and failed to do so. Their attention was directed to the loans already made to this borrower including a large construction loan on a building which he did not have funds to complete. And the findings are consistent with the conclusion that losses resulting from later loans in connection with this theatre were a consequence of the negligent approval of these earlier loans.

On November 27, 1928, the investment committee approved loans by the savings department to the Dunbar Contracting Co. — a corporation, the stock of which was owned by one Siegel who had borrowed large sums from the bank and whose connection with the corporation was understood by the directors — one loan secured by a first mortgage of vacant land at High and Winthrop streets and the other a large construction loan on first mortgage of an apartment house on Lot A, Fellsway. The facts found with regard to this loan on vacant land support the conclusion reached by the master that it required some explanation. And the large amount previously lent to this corporation and the past experience of the bank with con-

struction loans support the conclusion that "some consideration should have been given to the wisdom of this large additional construction loan." It was found by the master that no consideration was given to these two loans. This finding was based, in part at least, on the number of matters acted upon at the meeting of the investment committee, which lasted only five minutes. It is urged, however, in behalf of the defendants that the inference that consideration was not given to these loans could not rightly have been drawn from the shortness of the meeting for the reason that the loans may have been considered at the meeting of the directors which immediately preceded the meeting of the investment committee. In view, however, of the master's findings in regard to the procedure followed at meetings and the absence of anything in the findings indicating that these loans were considered at the preceding meeting of the directors the inference was not unwarranted. At the meeting of the investment committee on December 11, 1928, a construction loan of $75,000 to Siegel on Hancock Street, Quincy, was approved. The master makes these findings: "This additional $75,000 brought the Siegel total up to $353,500, or more than ten per cent of the assets of the savings department. While the defendants could not be expected to remember the exact amount of the Siegel loans, they must have realized — if they were paying any attention to their duties — that the figures were substantial and that in two weeks [they] were lending $185,000 to him and his company on construction mortgages, making the character and responsibility of Siegel of the utmost importance. Furthermore, by this time the defendants knew of the serious trouble which had developed with a number of these larger construction loans . . . involving about $600,000 of the bank's money. Those in the savings department amounted to nearly one fourth of the total mortgages in that department. . . . from this time on the directors were not warranted in approving large construction loans merely because such loans were recommended by the finance committee. From this time on they were not exercising due care if they failed to

inquire about the borrowers and as to the facts surrounding such loans and to see that there was some further check on the payments." See *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 143. Even though the actual foreclosures were relatively few, the history of the construction loans made by the bank supports this conclusion. The master found further that no "inquiry was made at the time of the Hancock Street loan and the payments were left in the hands of the two Loverings." This meeting of the investment committee lasted fifteen minutes. The conclusion was not plainly wrong that the members of the investment committee "were wanting in due care in approving this loan without some inquiry or investigation."

At a meeting of the investment committee on March 26, 1929, a loan by the savings department to Siegel secured by pledge of a second mortgage of Lot A, Fellsway, was approved. No finding of negligence on the part of directors not members of the finance committee was made. However, at a meeting of the investment committee in July a report of the commissioner of banks was read to the directors characterizing the loans to the Dunbar Contracting Co. as excessive and listing these loans as "Real Estate Loans where the Value of the Property is in Question." At a meeting of the investment committee on October 8, 1929, a further loan to Siegel secured by the pledge of a second mortgage on Lot A, Fellsway, was approved. The situation with respect to construction loans had then become worse. The finding of the master that members of the investment committee approving this loan who had been present at the meeting when the report of the commissioner of banks was read, or at the meeting when the first loan on Lot A, Fellsway, was approved, were negligent was not plainly wrong. See *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 146–151. Nor was the finding plainly wrong that the loan by the commercial department on the Hancock Street property to the Reserve Security Company, approved April 8, 1930, so far as it covered interest on the first mortgage already considered, the expenditures on the property and cost of completing the building,

resulted from negligence in taking such first mortgage. Since the loss on this loan is attributable to the first mortgage, it need not be determined whether the loan was also improper because the borrower was a wholly owned subsidiary of the bank. See G. L. (Ter. Ed.) c. 266, § 53A. This fact, however, did not prevent the loan from being, on the findings of the master, an improper diversion of the funds of the bank.

Findings of negligence in approving four other loans or groups of loans in 1930 and 1931 — 996 Farrington Street, Quincy; Main Street, Haverhill; Warren Street, Brighton; and Greenlay Apartments — are subject to similar considerations and need not be discussed in detail. They are not plainly wrong. The directors, according to the findings, were by this time aware of the "serious situation with reference to the bank's mortgages" and "knew or should have known that they could no longer rely upon the judgment of their finance committee on real estate values" nor as to construction loans. The members of the investment committee, who approved a loan by the savings department on a mortgage on 996 Farrington Street, according to the facts found, would have been negligent in approving it as a new loan and are not the less responsible for loss resulting therefrom because, though money was transferred from the savings department to the commercial department, no money was paid out by the bank on the loan, and the bank as a whole was benefited. Deposits in the savings department of a trust company are required to be kept separate from general assets of the company and are specially protected. G. L. (Ter. Ed.) c. 172, § 61. *Commissioner of Banks, in re Prudential Trust Co.* 240 Mass. 478, 482–484. The Main Street, Haverhill, loan by the commercial department to the Reserve Security Company was approved after the commissioner of banks had criticised previous loans on the same property and a special committee of the bank in a report to the directors had appraised the property at less than the principal of the mortgages then on it, as the directors voting to approve the loan knew or should have known. They were bound to

heed such a warning. This loan to a wholly owned subsidiary of the bank, treated as a real mortgage loan, was improper, and on the facts found the directors are not entitled to have it regarded more favorably to them. The Warren Street, Brighton, loans by the commercial department, which on the findings were improvident when made, were loans made to the Riverway Realty Corporation, a corporation largely, if not wholly, controlled by Siegel. And, as in the case of the Dunbar Contracting Co., the defendants understood his connection with the corporation. The Greenlay Apartments loan which resulted in loss to the bank was a loan on a second mortgage by the savings department following a construction loan on the same property by that department which itself was negligently approved. The aggregate amount lent was excessive. Negligence is found on the part of members of the investment committee who voted for both loans.

The other three transactions, involving directors not members of the finance committee, are the Royall Holding Corporation transaction, the Salem Street Realty Co. transaction and the loan to Siegel on pledge of a second mortgage on Lot A, Fellsway, approved March 26, 1929. In the Royall Holding Corporation transaction the defendant Eaton was benefited personally at the expense of the bank by receiving jointly with his partner, the defendant McKnight, an unwarranted payment for incorporation expenses of this company and was liable for the amount thereof. The Salem Street Realty Co. transaction was a purchase for the discharge of certain mortgages held by the bank, and cash and obligations of the bank, of shares of stock in the Salem Street Realty Co., the sole asset of which was the equity in certain real estate on Salem Street, Medford. The purpose of the defendant McKnight in carrying out the transaction was to conceal the loss sustained on these second mortgages and in effect to purchase the Salem Street property, which the law did not permit it to purchase directly. See G. L. (Ter. Ed.) c. 172, §§ 33, 38, 41, 42. The master found that this "was not a case where a bank might properly take real

estate from a debtor either as additional collateral for or in payment of an existing debt. It was a deliberate purchase by the bank." Compare *Hotchkin* v. *Third National Bank of Syracuse*, 219 Mass. 234. Furthermore, the amount of cash and obligations given by the bank was largely in excess of the value of the equity in the real estate owned by the bank. The directors at a meeting on July 1, 1930, voted to purchase the stock relying on their own opinion and the recommendation of the finance committee "which they knew or should have known by this time they could no longer trust." The finding of the master that "Under all the circumstances . . . the directors present at this meeting were responsible for any losses suffered by the bank as a result of the transaction" is not inconsistent with his other findings or plainly wrong.

As already stated there is no express finding of negligence on the part of directors not members of the finance committee with respect to the loan by the savings department approved on March 26, 1929, secured by a pledge of a second mortgage on Lot A, Fellsway. The master found, however, that "the members of the investment committee had notice of the fact that this loan was made on the security of a pledge of a second mortgage on property on which the bank held the first mortgage" and that if "the fact that this loan was made on the security of a second mortgage made it illegal . . . the . . . members of the investment committee [other than members of the finance committee] violated the law in approving it." (A similar situation existed as to the defendant Coulson, Jr., in reference to the loan approved October 8, 1929.) The investment of deposits in savings departments of trust companies in a loan on security of a pledge of a second mortgage is not authorized by statute (see G. L. [Ter. Ed.] c. 172, § 61; c. 168, § 54, cl. Ninth [e] [1]; see also cl. First) and ordinarily is illegal. No exception is made of a loan secured by a pledge of a second mortgage on property on which the bank holds the first mortgage. And in such a case there is no merger of the mortgages giving to the second mortgage the standing of a first mortgage. Very likely the pur-

pose of the statute in limiting the investment of savings
deposits in mortgages or in loans secured by pledges thereof
to first mortgages or pledges thereof is to provide that the
bank's rights in the mortgaged property as security be
senior to those of any other mortgagee.  But the statute
prescribing investments proper for savings deposits covers
the subject in minute detail and obviously was intended to
be followed literally and not to be extended by interpreta-
tion according to its presumed purpose.  Under the statute
literally construed the investment here in question was
"*ultra vires* or in violation of law."  See *Greenfield Savings
Bank* v. *Abercrombie*, 211 Mass. 252, 258.  By this loan the
funds of the bank were wrongfully diverted therefrom.  And
on the findings loss resulted.  For such loss, under *Green-
field Savings Bank* v. *Abercrombie*, 211 Mass. 252, 259, the
members of the investment committee approving the loan
are "*prima facie* responsible."  It is contended, however,
that on the findings these members of the investment com-
mittee are not responsible for the loss for the reason that
the investment was the result of an honest mistake as to
the corporate powers.  There is, however, no such finding.
And there was no mistake of fact on the part of these
members of the investment committee.  They knew the
kind of security which the bank was taking.  Furthermore,
if they had read the statutes governing the investment of
savings deposits they would have known that this invest-
ment was not authorized expressly and would at least have
been put on inquiry as to the effect of the statutes.  Yet
it does not appear that they read them or sought or re-
ceived any legal advice on the subject.  So far as appears
they did nothing to see that these investments were legal.
See *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 138.
Whether advice of counsel that the loan was legal would
have relieved these defendants from liability need not be
considered.  In the circumstances shown, though there is
no express finding of negligence on the part of members of
the investment committee — not members of the finance
committee — approving the loan, such members of the in-
vestment committee are not relieved from *prima facie* re-

sponsibility for the loss sustained by the bank as a result of this illegal investment. And there is no merit in the contention that the members of the investment committee are not responsible for such loss because the loan had been made by the finance committee before it was approved by the investment committee. Such approval was not merely acquiescence in a previously completed *ultra vires* transaction. It was an integral part of the transaction.

It is contended by the defendants Brewer and Coulson, Jr., — and also the defendant Coulson, who was a member of the finance committee — who ceased to be directors before the bank closed, that the losses found by the master to have resulted from the loans here considered were not sustained until after these defendants ceased to be directors and resulted not from their breaches of duty as directors but rather from intervening causes arising after they ceased to be directors. It is not fatal to recovery in this suit that it does not appear that, when these defendants ceased to be directors, the liabilities of the bank exceeded its assets or that losses had then been sustained by the bank as a result of the breaches of duty of these defendants. These defendants are responsible for losses resulting after they ceased to be directors from breaches of duty committed by them previous to their ceasing to be directors. Fletcher, Corporations, § 996. And conduct of continuing directors in connection with these loans after these defendants ceased to be directors was not such as to break the causal connection between the breaches of duty of these defendants and the losses sustained by the bank. There is no express finding of intervening negligence on the part of continuing directors in connection with these loans. But even if, in the situation to which these defendants contributed by their breaches of duty, the conduct of the continuing directors was not characterized by a high degree of prudence in taking new obligations, renewing loans or failing to liquidate loans, the losses sustained did not fall outside the field of "probable injurious consequences which were to be anticipated" from these defendants' breaches of duty. *Lane* v. *Atlantic Works*, 111 Mass.

136, 140.   Am. Law Inst. Restatement: Torts, § 435, comment b.   Furthermore, in connection with the Tragia Theatre, though after these defendants ceased to be directors loans were renewed and relatively small additional loans made, the master here found expressly that the defendants who voted in favor of the loan originally made by the savings department and the commercial department "were responsible for the later loans . . . which followed as a result of the original theatre loan."   This finding is not inconsistent with other findings or plainly wrong.

2. Members of the finance committee.

Members of the finance committee in many instances voted to approve the transactions described as "real estate loans" included among the fourteen loans or groups of loans already considered and are responsible for resulting losses in accordance with the principles stated.   In many instances there are other grounds for the liability of members of the finance committee for such losses.   These additional grounds for liability of members of the finance committee are similar to grounds of liability for losses resulting from the other sixteen loans or groups of loans and need not be considered separately.   In the case of one of these fourteen transactions previously considered — Royall Holding Corporation transaction — the defendant McKnight is found to have acted in bad faith.   He is liable on that ground to the extent to which he profited jointly with the defendant Eaton from the transaction.   In the case of another loan previously considered — the loan on a pledge of a second mortgage of Lot A, Fellsway, approved March 26, 1929 — members of the finance committee were found to have been negligent in authorizing the loan.   And in the case of a third loan already considered — the Warren Street, Brighton, loan — the approval of which by the directors was found to have been negligent, the members of the finance committee, one of whom was not present at the meeting of the directors at which the loan was approved, are found to have been negligent in making the loan.

Sixteen loans or groups of loans summarized as "real estate loans" remain to be considered.   Except for one

loan with respect to which the defendant Coulson is found to have been negligent — 57 Burnside Avenue — the defendants involved are McKnight, Frank W. Lovering and Lewis H. Lovering. As to the defendant McKnight, the master makes these general findings: "He was the founder of the bank and was its president throughout its existence. . . . He presided at all meetings. At meetings of the directors and investment committee he usually acted as spokesman for the finance committee. He directed the policies and methods of the bank. He was familiar with everything that went on. Practically every loan in question here was approved by him. He dealt personally with Tragia, Siegel, Frankini and most of the other borrowers and knew exactly the sort of persons with whom he was dealing and the risks the bank was running in taking these loans. . . . [he] was guilty not merely of negligence but of bad faith in administering the affairs of the bank during the period here in question."

Most of these loans were made by the savings department. As to fourteen of these loans or groups of loans there are express findings of negligence of one or more members of the finance committee — usually in making or authorizing the loan, in some instances in authorizing payments on construction mortgages. There are findings in connection with loans by the savings department that the certificate of value required by G. L. (Ter. Ed.) c. 168, § 54, cl. First, was not filed, that values certified were far in excess of the fair values; and that loans were excessive in amount based upon such fair values. In some instances responsibility for losses on later loans is found to have resulted from negligence in making earlier loans. In one instance — 996 Farrington Street — some members of the finance committee knew that one member, Cushing, was profiting personally by the loan. Recital of the subsidiary findings in detail and analysis of the findings as to each loan are not required. It is enough to say that the findings that some of the defendants were negligent in connection with these loans and that losses on later loans resulted from negligence in making earlier loans are not inconsistent with the sub-

sidiary findings or plainly wrong. Indeed no such argument has been addressed to us. In the case of the loan listed as "Hancock Street, second mortgage Cushing" though there is no finding of negligence on the part of any defendant it is found that the defendant Cushing profited personally by the loan and that "the action of both McKnight and Cushing was improper." This finding, particularly in connection with the general findings in regard to the defendant McKnight, is sufficient to charge him with liability for the amount by which the defendant Cushing profited by the loan at the expense of the bank. So also, though there is no express finding of negligence·on the part of the defendant McKnight in connection with the loan on Greenlay land (Lot A-2, Bradlee Road), the facts found are sufficient to charge him with loss, if any, sustained by the bank by reason of this loan.

It follows from what has been said that as to each of the so called "real estate loans" in the summary in the master's report under the name of each director, such director is liable (except as discharged) for the loss to the bank resulting from such loan. In view of this conclusion it is not necessary to consider whether in any case the same result might be reached on grounds not here discussed.

Second.   Making or approving loans in violation of G. L. (Ter. Ed.) c. 172, § 40.

The master's report contains a summary in the case of each defendant of loans classified as "Excessive Loans to a Single Individual" with respect to which such defendant in some view of the law may be liable for violation of G. L. (Ter. Ed.) c. 172, § 40.

G. L. (Ter. Ed.) c. 172, § 40, with exceptions not here material, is as follows: "The total liabilities of a person . . . including in the liabilities of a firm the liabilities of its several members, for money borrowed from and drafts drawn on any such corporation having a capital stock of five hundred thousand dollars or more shall at no time exceed one fifth part of the surplus account and of such amount of the capital stock of such corporation as is actually paid up. Such total liabilities to any such corporation

having a capital stock of less than five hundred thousand dollars shall at no time exceed one fifth of such amount of the capital stock of the corporation as is actually paid up, or one tenth part of the surplus account and of such amount of the capital stock of such corporation as is actually paid up."

The primary question on this branch of the case is whether this statute applies to loans of the savings department secured by mortgages of real estate, either alone or in combination with loans of the commercial department. We think that it does not.

The terms of G. L. (Ter. Ed.) c. 172, § 40, are broad enough to include liabilities for money borrowed from the savings department whether or not the loan is secured by mortgage of real estate. The trust company, though having two separate departments, is an entity. *Commissioner of Banks, in re Prudential Trust Co.* 240 Mass. 478, 483. *Commissioner of Banks, in re Prudential Trust Co.* 244 Mass. 64, 73. Money borrowed from the savings department is borrowed from the corporation. Unlike the general provision governing investments of a trust company, this section is not in terms limited in its application to "capital or general deposits" (see G. L. [Ter. Ed.] c. 172, § 33), as distinguished from savings deposits which are "special deposits." G. L. (Ter. Ed.) c. 172, § 61. See also G. L. (Ter. Ed.) c. 172, § 73. There are, however, specific provisions for dealing with and investing savings deposits which are not applicable to commercial deposits. G. L. (Ter. Ed.) c. 172, § 61, provides that savings deposits "shall be special deposits and shall be placed in said savings department, and all loans or investments thereof shall be made in accordance with the law governing the investment of deposits in savings banks." The law referred to is G. L. (Ter. Ed.) c. 168, § 54, which provides that deposits in savings banks "shall be invested only" as therein described in great detail. G. L. (Ter. Ed.) c. 172, § 62, provides that savings deposits "and the investments or loans thereof . . . shall not be mingled with the investments of the capital stock or other money or property belonging to or controlled

by such corporation, or be liable for the debts or obligations thereof until after the deposits in said savings department have been paid in full," and provides that the "accounts and transactions of said savings department shall be kept separate and distinct from the general business of the corporation."

Prior to the passage of St. 1908, c. 520, which first provided for a savings department in a trust company, savings deposits in such a company were general deposits, could be invested in any securities legal for the investment of the general assets of the trust company (see St. 1888, c. 413, § 6; R. L. c. 116, § 12) and obviously were subject to the provisions now contained, in somewhat changed form, in G. L. (Ter. Ed.) c. 172, § 40. See St. 1888, c. 413, § 17; R. L. c. 116, § 34. St. 1908, c. 520, contained in substance the provisions referred to above now embodied in G. L. (Ter. Ed.) c. 172, §§ 61, 62. See St. 1908, c. 520, §§ 2, 3. Section 2 provided in terms that loans and investments of savings deposits "shall be made in accordance with the statutes governing the investment of deposits in savings banks." And § 16 of St. 1908, c. 520, provided that "All acts and parts of acts inconsistent herewith are hereby repealed." The provision governing investment of savings deposits of a trust company was in form at least an authorization of, as well as a limitation upon, the investment of such deposits. The natural interpretation of this provision, particularly in view of the highly detailed provisions governing the investment of deposits in savings banks therein referred to, is that the provisions governing investment of deposits in savings banks were in all particulars substituted for the provisions previously applicable to the investment of savings deposits in a trust company and did not merely add further limitation thereto. See R. L. c. 113, § 26, specially cls. First, Fifth and Seventh; G. L. (Ter. Ed.) c. 168, § 54, specially cls. First, Third, Sixth A, Seventh and Ninth. So interpreted the provision in St. 1908, c. 520, § 2, in regard to the investment of savings deposits was inconsistent with the provisions previously applicable including those embodied in somewhat changed

form in G. L. (Ter. Ed.) c. 172, § 40 (see St. 1888, c. 413, § 17; R. L. c. 116, § 34), and such provisions were thereby repealed as to savings deposits. The general revision of the statutes in General Laws is to be construed as continuing the previous law since in the respects here material no change is indicated. *Worcester County National Bank* v. *Commissioner of Corporations & Taxation*, 275 Mass. 216, 218. The conclusion here reached is supported by the apparent purpose of the Legislature to place savings deposits in trust companies as nearly as possible on the same footing, in regard to safety of investment, as deposits in savings banks. There are, however, material differences, particularly in that the profits of a savings department go to the general assets of the trust company and not to the depositors as in a savings bank, and in that the capital stock of the trust company and the liabilities of the stockholders thereunder are security for savings deposits, and savings depositors have an equal claim with other creditors of a trust company on its capital and other property. *Commissioner of Banks, in re Prudential Trust Co.* 240 Mass. 478, 483. *Commissioner of Banks, in re Prudential Trust Co.* 244 Mass. 64, 74. *Commissioner of Banks* v. *Cosmopolitan Trust Co.* 253 Mass. 205, 220. See St. 1908, c. 520, §§ 4, 5; G. L. (Ter. Ed.) c. 172, §§ 63, 65. But these differences do not warrant the conclusion that it was intended by the Legislature to retain the provisions now embodied in G. L. (Ter. Ed.) c. 172, § 40, as a limitation upon the investment of savings deposits in addition to the limitations imposed on the investment of deposits in savings banks.

On the interpretation here given to G. L. (Ter. Ed.) c. 172, § 40, and the master's findings the only loans made or approved in violation of this section were some of the Tragia Theatre loans by the commercial department. Many of the directors are liable for losses resulting from these loans on grounds independent of any violation of G. L. (Ter. Ed.) c. 172, § 40. Other directors, however, are liable for such losses, if at all, only because of violations of this section. Whether at any time this section was violated depends on the aggregate amount at that time of

loans to any one borrower.  The findings of the master show that the aggregate amount of Tragia Theatre loans by the commercial department was never for any considerable period of time largely in excess of the amount of permissible loans to a borrower and that in several instances where the aggregate amount of loans was excessive, within a short period of time, by reason of an increase in the capital and surplus of the trust company, it ceased to be excessive. And the master has found "that there was no negligence on the part of any of the defendants in connection with any violation of this section."  Since these directors — none of whom were members of the finance committee — were not required to know everything disclosed by the books of the bank and could rely to some extent for information and advice on the officers of the bank and the members of the finance committee (*Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 137) the finding that they were not negligent is not plainly wrong.  And it is not inconsistent with the other findings.  This finding imports that these directors neither knew nor ought to have known that at any time the aggregate amount of the Tragia Theatre loans was in excess of the permissible amount fixed by G. L. (Ter. Ed.) c. 172, § 40, and that they had done all that they were required to do to see that this statute was observed.

G. L. (Ter. Ed.) c. 172, § 40, is mandatory, and places restrictions on the power of directors.  See *Greenfield Savings Bank* v. *Abercrombie*, 211 Mass. 252, 258.  But the statute does not provide in terms that directors approving loans in violation of it shall be liable for resulting losses, and absolute liability for such losses is not to be implied. As was stated in the *Greenfield Savings Bank* case with reference to the effect of another mandatory statute, directors are "*prima facie* responsible" for losses resulting from violations thereof (page 259).  But it is clearly implied that such responsibility may be rebutted by showing that the directors were without fault.  And the cases relied on by this court in the *Greenfield Savings Bank* case are not inconsistent with that implication.  Furthermore, the rule in regard to the duty of directors of a trust company

with reference to statutes governing trust companies stated in *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, that "They must do something to see that statutes established for the protection of depositors are observed and followed" (page 138), is in accord, as is the decision in the case in regard to the liability of directors for losses resulting from loans in violation of the statute now in question (page 157). See also *Cunningham* v. *Commissioner of Banks*, 249 Mass. 401, 428–429. The duty resting on directors of a trust company includes the duty to use "ordinary diligence in ascertaining the condition of its business." *Martin* v. *Webb*, 110 U. S. 7, 15, quoted in *Cosmopolitan Trust Co.* v. *Mitchell*, 242 Mass. 95, 120. But a finding, as here, which imports on the part of the directors an honest, nonnegligent mistake as to the aggregate amounts of the Tragia Theatre loans at the times the various excessive loans were made, rebuts the *prima facie* responsibility of the directors for losses resulting from such excessive loans. See *Hodges* v. *New England Screw Co.* 1 R. I. 312, 346, 348; *S. C.* 3 R. I. 9; *Dovey* v. *Cory*, [1901] A. C. 477; *In re Kingston Cotton Mill Co. (No. 2)*, [1896] 1 Ch. 331, 347–348; Fletcher, Corporations, § 1025. No intention to impose greater liability on such directors can be inferred from the provision of G. L. (Ter. Ed.) c. 167, § 47, which subjects to a criminal penalty a director of a trust company "who knowingly and wilfully does any act forbidden to him or to such bank by any provision of chapters one hundred and sixty-seven to one hundred and seventy-two, inclusive, or who knowingly and wilfully aids or abets the doing of any act so forbidden." But we do not imply that by reason of this statute civil liability is imposed only upon directors "knowingly and wilfully" violating G. L. (Ter. Ed.) c. 172, § 40. Compare, however, U. S. Rev. Sts. §§ 5200, 5239; *Bowerman* v. *Hamner*, 250 U. S. 504, 511; *Corsicana National Bank* v. *Johnson*, 251 U. S. 68, 71–72.

There is, therefore, no liability of any director by reason of violation of G. L. (Ter. Ed.) c. 172, § 40, who is not found liable on independent grounds for loss resulting from the Tragia Theatre loans.

Third.   Illegal personal profits of directors.

The master's report contains findings with respect to personal profits of certain directors.   No contention is made by the plaintiff that on the master's findings there is any liability for such personal profits except upon the defendants McKnight and Cushing.

1. McKnight.   According to the findings of the master this defendant in the years 1929 and 1930 received from one Frankini for services in connection with obtaining certain contracts the sum of $23,500 and the money was derived by said Frankini from loans from the bank.   The subsidiary findings, which need not be recited, tend to show that this money was received by this defendant in violation of his duty as a director of the bank.   The master's ultimate finding is that if "the burden of proof is on McKnight to show that the money was repaid to the bank . . . this burden has not been sustained by him and . . . he owes the bank the sum of $23,500 on this item."   This finding is not inconsistent with the subsidiary findings or plainly wrong.   *United Zinc Co.* v. *Harwood,* 216 Mass. 474, 476.   *Holman* v. *Moore,* 259 Mich. 63, 67.   The burden of accounting for the money so received was on this defendant.   *Little* v. *Phipps,* 208 Mass. 331, 334–335.   *Pappathanos* v. *Coakley,* 263 Mass. 401, 408.

2. Cushing.   The following facts appear from the master's findings:  This defendant had a mortgage, or a partial assignment of a mortgage, on each of two parcels of real estate on which the bank already had security by way of mortgage senior to that of the defendant.   The bank made new loans on mortgages on these parcels of land and out of the proceeds of these loans paid the defendant's mortgages.   Such payments were not for the interest of the bank.   The defendant voted for the new loans knowing that he was to be paid out of the proceeds thereof.   The master found that in both instances the defendant acted improperly in authorizing the new loans and that "the loss to the bank is greater than the amount paid to Cushing and . . . the bank's loss has been increased by the exact amount thus paid Cushing."   The findings are not plainly

wrong and establish the liability of this defendant for the amount of the bank's loss.

Fourth.   Declaration of dividends in violation of law.

The master's report lists in the case of each defendant meetings at which he was present and voted to declare dividends on deposits in the savings department which the plaintiff contends were declared illegally.

The plaintiff argues that the dividends declared at these meetings were illegal because in violation of G. L. (Ter. Ed.) c. 172, § 80, which provides in part that "No dividend shall be paid by any such corporation [a trust company], while it continues its banking operations, to an amount greater than its net profits then on hand, exclusive of the surplus fund provided for in this section, after deducting from such net profits its losses and bad debts." This language, its context and other provisions of the statutes in regard to trust companies indicate that this statutory prohibition applies to the payment of dividends on shares of stock of a trust company out of its general funds and not to the declaration or payment of dividends on deposits in the savings department which are to be paid before the income from the investment of funds in the savings department "accrue[s] as profits to such corporation and . . . [is] transferred to its general funds." G. L. (Ter. Ed.) c. 172, § 65.   Dividends on shares of stock in a trust company were considered in *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 152, 157, relied on by the plaintiff.

There are, however, statutory provisions governing the payment of interest or dividends on deposits in a savings department of a trust company.   G. L. (Ter. Ed.) c. 172, § 68, is as follows: "Immediately before a meeting of the directors called to consider the declaration of a dividend by the savings department of every such trust company, the investment committee shall make or cause to be made an examination of the income, profits and expenses for the six months' period next preceding the date of the proposed dividend, and shall report to the directors the estimated net earnings of the said department for the said period. No dividend shall be paid unless it is declared and author-

ized by the directors after the said examination, and a copy
of the said report shall be filed and preserved with the
records of the corporation.   Ordinary dividends in such a
department shall not exceed the rate of five per cent a year,
and extra dividends may be paid as by savings banks, under
and in accordance with section fifty of chapter one hundred
and sixty-eight."   G. L. (Ter. Ed.) c. 167, § 17, provides
in part that "Dividends or interest on deposits in the sav-
ings departments of trust companies . . . may be declared
and paid for periods of not less than one month nor more
than six months, as determined by their by-laws, from in-
come which has been earned and which has been collected
. . . during the next preceding six months and which is
available after deducting previous dividends paid, the
reasonable expenses incurred in the management thereof,
the taxes paid and the amounts required to be set apart
for the guaranty fund."   G. L. (Ter. Ed.) c. 172, § 64, pro-
vides for setting apart such a guaranty fund.

No contention is made that any dividend prior to that of
May 1, 1928, was declared in violation of law.   With respect,
however, to each of the seven dividends declared thereafter
for payment at intervals of six months each, the plaintiff
contends that the income available for such payment was
insufficient for the purpose, and that consequently the
dividend was unlawful.   This contention is based on the
ground that bonuses taken on mortgages representing
the difference between the face of the mortgages and
the amounts lent to the borrowers and interest items — of
four groups — deducted from, or charged to, loans or
paid by borrowers out of the proceeds of loans which were
treated as income were improperly so treated.   We pass
without discussion the question whether such bonuses or
any of such interest items constitute income.   For even if
they do not, on the findings of the master, the plaintiff
cannot prevail on this branch of the case.

The controlling principles are like those already con-
sidered in connection with G. L. (Ter. Ed.) c. 172, § 40.
Directors of a trust company as stated in *Prudential Trust
Co.* v. *McCarter*, 271 Mass. 132, 138, "must do something

to see that statutes established for the protection of depositors are observed and followed." But the extent of this duty and of the corresponding liability for breach thereof depends on the nature of the statute.

G. L. (Ter. Ed.) c. 172, § 68, already quoted, recognizes that directors are to look to the investment committee for information upon which to act in declaring dividends and that the investment committee, though responsible for furnishing such information, may delegate the making of the "examination of the income, profits and expenses." They may "cause" it to be made. This section, also, by providing for a report of "net earnings" which are "estimated," recognizes that there is some field for the exercise of judgment. To a considerable degree, moreover, as the statutes appear to recognize by permitting the delegation of the duty of making the examination, the determination of income, profits, expenses and net earnings is peculiarly an accounting function to be exercised with respect to facts shown by the books of the trust company. When, therefore, G. L. (Ter. Ed.) c. 167, § 17, authorizing the declaration and payment of dividends, is read in the light of other statutory provisions, it appears by clear implication that the standard of duty of directors of a trust company in declaring and paying dividends where the prescribed method is followed is the standard of integrity, skill and prudence fixed by the common law for the performance of the functions of such directors generally. Such directors "are not required to be expert accountants or familiar with the details of bookkeeping or to know everything disclosed by the books of the bank." They "are entitled to rely upon the information and advice given them by executive officers whose probity and competency are not under just suspicion." But they "must heed warnings from responsible sources." *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 137–138. The implication is not warranted that where the statutory method prescribed for ascertainment by directors of earnings available for dividends on deposits in the savings department is followed and directors, acting with integrity, skill and prudence, are mistaken as to the

amount of earnings so available, they are absolutely liable for the payment of dividends in excess of the earnings available therefor as disclosed by a later judicial determination of the amount of such earnings. See *Lippitt* v. *Ashley,* 89 Conn. 451; *Gaffney* v. *Colvill,* 6 Hill (N. Y.) 567–576; *Dovey* v. *Cory,* [1901] A. C. 477; *In re Kingston Cotton Mill Co. (No. 2),* [1896] 1 Ch. 331; 1 Morse, Banks & Banking (6th ed.) page 333; and see also cases collected in 35 Yale Law Journal, pages 870–875. There is no provision of statute imposing a civil liability on directors for the declaration and payment of dividends and consequently none which can be interpreted as expressly imposing an absolute liability therefor. Compare G. L. (Ter. Ed.) c. 156, §§ 2, 37. An intention to impose such an absolute liability cannot be inferred from G. L. (Ter. Ed.) c. 167, § 47, already referred to, or from G. L. (Ter. Ed.) c. 167, § 18, which provides a criminal penalty for paying or authorizing payment of a dividend "unless the same has been earned and collected as provided in the preceding section."

On the facts found by the master and the principles of law above stated, there was no liability on the part of any defendant for the declaration of a dividend in violation of law. The master found expressly that "the defendants were not guilty of negligence in voting to declare the dividends." This finding is not inconsistent with other findings or plainly wrong. Prior to declaration of each dividend a special committee of the investment committee was appointed to make the examination which the investment committee was required by statute to make or cause to be made and each committee made a report. None of the members of the special committees "was experienced in accounting and . . . all relied entirely on the information given them by the treasurer and other accounting officers." However, "only an accountant would have discovered from the books that interest items credited fell within the criticised groups . . . the special committees were informed by the treasurer or manager of the savings department that the interest had been earned . . . [and]

these committees had no reason to doubt the statements."
Each bonus "was entered separately on the profit and loss
account where it would have been obvious to anyone
making even a casual inspection of that account." But
it appears in several instances that earnings available for
the payment of dividends exclusive of bonuses, but inclu-
sive of the criticised interest items, were sufficient for the
payment of such dividends, and the determination of the
question whether the earnings so computed were sufficient
for the payment of other dividends would have required
some familiarity with details of bookkeeping. The finding
that "some of the youngest and least experienced members
of the investment committee" were named to the special
committees does not require the conclusion that the di-
rectors were negligent in choosing such committees or in
relying on their reports. Furthermore, only in one instance
was the practice of the bank in connection with any of the
items in question criticised in the audit of the commissioner
of banks and thereafter the particular practice criticised
was discontinued. Compare *Prudential Trust Co.* v. *McCar-
ter,* 271 Mass. 132. There are some indications in the
master's findings that the statutory procedure after the
examinations were made by the special committees was not
followed precisely, but considering all the findings of the
master, which need not be analyzed in detail, we cannot
say that there were such substantial deviations therefrom
as to overcome the finding that the directors were not
negligent in voting to declare the dividends. And a viola-
tion of the statutory provisions intentionally or in bad
faith is not to be inferred from the findings.

Fifth. Damages.

The causes of action for which this suit is brought are
the breaches of duty of the several defendants as directors
of the bank through negligent or otherwise improper per-
formance by them of the functions of their offices. The
duty arose by the contract of each defendant, implied from
acceptance by him of the office of director, and action for
breach thereof sounds in contract (*Cunningham* v. *Com-
missioner of Banks,* 249 Mass. 401, 429; *Prudential Trust*

*Co.* v. *McCarter*, 271 Mass. 132, 138) though in some respects liability is governed by principles of tort. Compare, however, *Corsicana National Bank* v. *Johnson,* 251 U. S. 68, 84, where the suit was based upon a statutory liability. The cause of action growing out of each transaction here involved is the diversion of funds from the bank by the misconduct of a director. And such cause of action arose at the time of such misconduct. *Cunningham* v. *Commissioner of Banks,* 249 Mass. 401, 429. But proof of damages resulting from such misconduct is essential to recovery. And the measure of damages is the loss sustained by the bank. See *Greenfield Savings Bank* v. *Abercrombie,* 211 Mass. 252, 259; *Cosmopolitan Trust Co.* v. *Mitchell,* 242 Mass. 95, 120.

The liability of each director is several. He "is liable only for the results of his own misconduct although such results may be magnified . . . by the concurring misconduct of other directors." *Prudential Trust Co.* v. *McCarter,* 271 Mass. 132, 138. In accepting the office of director each defendant "must be taken to have contemplated responsibility for losses to the bank, whatever they were, if chargeable to his fault." *Bates* v. *Dresser,* 251 U. S. 524, 531. And this is true even though succeeding faults of other directors contribute to the ultimate loss if such succeeding faults are in the field of reasonable anticipation so that the causal relation between the original fault and the loss sustained is not broken. This principle is applicable to defendants who ceased to be directors before the bank closed. In these circumstances losses are not to be apportioned among directors at fault.

The basis for the computation of loss resulting from wrongfully making or approving a loan is the amount of the loan made or approved and thus the amount of money wrongfully diverted from the bank or a department thereof. *Cunningham* v. *Commissioner of Banks,* 249 Mass. 401, 429. Since the liability of directors is based upon the wrongful diversion of funds and not upon nonpayment of borrowers' obligations the directors are not liable for amounts, such as bonuses, which are included in the obligations of

the borrowers in excess of the amounts of money actually diverted where, as here, there is no finding that the bank has been damaged by the inclusion of such additional amounts in the obligations of the borrowers. To amounts so diverted are to be added amounts expended by the bank in consequence of the wrongful transactions. As against amounts wrongfully diverted from the bank or a department thereof, the defendants responsible for such diversion are entitled to credit for salvage thereon. See *Corsicana National Bank* v. *Johnson,* 251 U. S. 68, 86–87. This means, of course, that such defendants are to be credited with amounts actually received on account of an improper loan or in liquidation of the security therefor. *Cunningham* v. *Commissioner of Banks,* 249 Mass. 401, 429. And where the bank has security for a loan by way of mortgage of real estate or holds real estate which it has acquired by foreclosure of such a mortgage, which security or real estate has not been liquidated, the defendants are entitled also, as salvage in computation of the loss on such loan, to credit for the amount for which the mortgage or real estate can be liquidated, ascertained as of a date not later than the entry of the final decree in this suit. This is implied in the decision of *Cunningham* v. *Commissioner of Banks,* 249 Mass. 401, 429, where the court approved a finding of the amount of loss chargeable to a director improperly approving a loan which, as the records show, credited against the amount wrongfully diverted an amount which it might reasonably be anticipated would be paid by the borrower. Compare, however, *Corsicana National Bank* v. *Johnson,* 251 U. S. 68, 87. The amount for which the mortgage or real estate can be liquidated is not so conjectural that it cannot be made an element in the computation of losses or that the fact that such mortgage or real estate has not been liquidated renders the suit premature. So far as the case of *Green* v. *Officers & Directors of Knoxville Banking & Trust Co.* 133 Tenn. 609, relied on by the defendants, is inconsistent with this conclusion, we are not inclined to follow it. Decreases in the amounts for which mortgages or real estate can be liquidated occurring after the loans were made

are proper elements to be considered in determining the amount of the losses for which directors are liable (see *Hun* v. *Cary*, 82 N. Y. 65, 78) and such decreases even after the suit was brought are to be considered in making up the final decree since the defendants are responsible for losses up to that time and such losses are within the scope of the bill. *Bauer* v. *International Waste Co.* 201 Mass. 197, 203–204. The master has found the market value of real estate subject to mortgages held by the bank and of real estate acquired by the bank by foreclosure of such mortgages, which has not been liquidated, as of the date of the closing of the bank and also as of October 7, 1932, a date after the suit was brought and during the time of the hearings before the master which covered a period of several months. Evidence of such value on each of these dates was admitted subject to the defendants' exceptions. No evidence was offered of any change in such value during the time of the hearings. As between these dates, October 7, 1932, is the date as of which the market value of the real estate — representing the amount for which the mortgages and the real estate could be liquidated — is to be taken. Evidence of such value as of that date, therefore, was admitted rightly and the admission of evidence of such value as of the date of the closing of the bank was not prejudicial to the defendants. No question of the reduction of losses for which directors are responsible by reason of the rights of the bank to recover against borrowers in the cases of improper loans arises. The master finds — and his finding is not inconsistent with other findings or plainly wrong — that "all loans here involved will be a total loss to the bank except so far as it can realize from or on the security it holds." And there is no question of salvage on personal profits received by the defendants Eaton and McKnight.

The Salem Street Realty Co. matter which was a purchase of stock by the bank is governed by similar principles. The master found that the amount paid for the stock was in excess of its value at the time of the purchase. The bank still holds the stock. There was no evidence

before the master of the value of the stock at the time of the closing of the bank or at the time of the hearing. On these findings there is at least a *prima facie* responsibility on the directors at fault, which has not been rebutted, for amounts paid by the bank for the stock in excess of its value at the time it was purchased. And since the transaction by which the stock was acquired was a single transaction the bank obtained nothing of value so far as this stock is concerned to reduce the loss otherwise sustained on the loan listed in the summary of real estate loans as "Lots A and B Ellington Street and Salem Street Realty Co."

The general rule with respect to interest, as stated in *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 158, is that the "defendants are chargeable with simple interest on all sums found due from them from the time the loss to the bank occurred." For the proper application of this rule, however, reference must be made to the cases cited in support of it. The loss sustained by reason of the personal profits received by the defendants Eaton and McKnight occurred at the time these defendants received money from the bank. And on the master's findings loss to the bank in the Salem Street Realty Co. matter occurred at the time of the purchase of the stock in that company for an excessive price. In the cases of improper loans the times at which the losses occurred are not fixed and the findings are of losses sustained determined as of certain dates. We think the principle that interest does not run until damages are liquidated is inapplicable to these loans but that interest is to be included as an element of damage in order to determine the amounts of the losses actually sustained by the bank (compare *Gamble* v. *Brown*, 29 Fed. Rep. [2d] 366, 381) on the ground that loss of income follows loss of principal. *Dewey* v. *Burke*, 246 Mass. 435, 437. *State Street Trust Co.* v. *Walker*, 259 Mass. 578, 584. *McCormick* v. *King*, 241 Fed. Rep. 737, 746. For periods for which interest has actually been received in accordance with the terms of the obligations, no loss of income has been sustained by the bank. And in

such instances there is no sufficient basis in the findings for holding that a loss of income has been sustained even though the rate of interest was less than the legal rate. But where interest has not actually been received, whether before or after foreclosure of a mortgage, since the responsibility of the directors is not for the performance of the obligations of the borrowers but rather for their own wrongful diversion of funds of the bank or a department thereof, interest should be computed at the legal rate. Compare *Parker* v. *Nickerson*, 137 Mass. 487, 495–496. And it should be computed on each loan from the time it was made to the time or times at which collection of or on account of the principal thereof was made or, so far as collection has not been made, to the date of the final decree.

Since on the facts agreed upon by the plaintiff and certain defendants on the basis of evidence which we hold to be admissible and facts found as to other defendants the amount recoverable in this suit will be less than the excess of the unpaid debts of the bank over the value of its assets, it is unnecessary to consider whether the plaintiff could recover any amount in excess of that necessary to liquidate the balance of such unpaid debts. Compare *Prudential Trust Co.* v. *McCarter*, 271 Mass. 132, 157.

Sixth. The suit was not brought prematurely as the defendants contend. The previous discussion of damages disposes of this contention. The causes of action were breaches by the several defendants of their duties as directors. *Cunningham* v. *Commissioner of Banks*, 249 Mass. 401, 429. Obviously these breaches occurred before the suit was brought. And though proof of loss resulting to the bank from such breaches is essential to recovery in this suit, such proof can be made before the bank has been fully liquidated.

Seventh. The defendants' exceptions to the master's report do not require detailed discussion. Many of the questions raised thereby are disposed of by what has been said. Other questions are based upon evidence not reported and consequently are not reviewable. *Baush Machine Tool Co.* v. *Hill*, 231 Mass. 30, 41. The only excep-

tions specifically urged are based on the admission or exclusion of evidence. No prejudicial error is shown in such admission or exclusion. And it cannot be said that the question raised by the exception to the admission of evidence was not fairly raised without the further report of evidence which was requested. See *Pearson* v. *Mulloney,* 289 Mass. 508, 512–513. As to this and other evidence report of which was requested, the matter lay in the discretion of the trial judge. *Cook* v. *Scheffreen,* 215 Mass. 444, 447–448. And nothing in the record takes the case out of the ordinary rule that the recommittal of a master's report is discretionary with the trial judge. *New Method Die & Cut-Out Co. Inc.* v. *Milton Bradley Co.* 289 Mass. 277, 286–287. There was no error in denying the defendants' motions to recommit the report and to require a further report of the evidence, in overruling their exceptions and in confirming the report. The interlocutory decree to that effect must be affirmed. No final decree was entered. The case is remanded to the county court for further proceedings not inconsistent with this opinion. *Prudential Trust Co.* v. *McCarter,* 271 Mass. 132, 158.

*Ordered accordingly.*