232 F.2d 241
 S. Burton SPIRT, Plaintiff-Appellant,
v.
S. D. BECHTEL et al., Defendants, and
C. F. Bradley, John M. Franklin, V. J. Freeze, C. D. Gibbons, Herman Goldman, John W. Hanes, R. M. Hicks, Cletus Keating, G. F. Ravenel,
Mary Dempsey Harris and United States Trust Company of New York, as executors of the estate of Basil Harris, deceased,
Helen Whitney Gibson and Manufacturers Trust Company, as executors of the estate of Harvey G. Gibson, deceased,
Louis Walker, Elisha Walker, Jr., and Robert E. Walker, as executors of the estate of Elisha Walker, deceased, and United States Lines Company, Defendants-Appellees.
 No. 197.
 Docket 23832.
 United States Court of Appeals Second Circuit.
 Argued December 7, 1955.
 Decided March 13, 1956.
 
 Louis H. O. Fischman, New York City (William E. Haudek, of Pomerantz, Levy & Haudek, New York City, of counsel), for appellant.
 Cravath, Swaine & Moore, New York City (Ralph L. McAfee, Edward Q. Carr, Jr., New York City, and Peter W. Anson, New York City, of counsel), for appellees.
 Before SWAN, FRANK and LUMBARD, Circuit Judges.
 SWAN, Circuit Judge.
 
 
 1
 This is a stockholder's derivative action brought on behalf of the United States Lines Company against directors and officers of said corporation who are alleged to have received unlawful compensation and to have profited through breach of fiduciary duties. The complaint was filed October 24, 1949. Federal jurisdiction is based on diversity of citizenship. The defendants, other than the corporation, are nine directors who served for various periods between January 1, 1943 and December 31, 1949, and the estates of three deceased directors. Trial to the court without a jury was had on documentary evidence and pretrial depositions. The issues were limited to the existence of liability, the amount of recovery, if any, being left for a future accounting. Judge Palmieri gave judgment for the defendants. The plaintiff has appealed.
 
 
 2
 The trial court's opinion is reported in D.C., 129 F.Supp. 872. The facts therein set out need not be here repeated. When desirable for the discussion additional facts will be mentioned. The complaint alleges three causes of action, which will be considered seriatim. The first seeks recovery of "option profits," by which is meant the difference between the price of $5.81 per share paid to the corporation by the optionee upon exercising his option and the market value of the shares thereby acquired. It is the plaintiff's theory that, if the optionee's fixed salary for the year when the option was exercised, plus his option profits, exceeded $25,000, the excess is recoverable by the corporation as "compensation" received by the optionee in violation of the statutory limit imposed by sections 805(c) and (f) of the Merchant Marine Act, 46 U.S.C.A. § 1223 (c) and (f), set out in the margin.[1]
 
 
 3
 During the years in which the options were exercised the corporation was a "contractor" within the meaning of section 805(c) and received subsidies under the Merchant Marine Act. The parties are in dispute as to whether the statutory provisions create in the subsidized ship operator the right to recover the excess above $25,000 per annum received by any director, officer or employee, the defendants contending that § 805(c) was intended only to safeguard the public interest in the expenditure of governmental subsidies granted to maritime carriers, and was not designed to create private rights and obligations.[2] The trial judge did not pass on this contention, since he found no violation of § 805(c). Nor need we pass on it, since we agree with his determination that the "option profits" were not "compensation" for personal services within the meaning of the section.*
 
 
 4
 The purpose of the stock option plan, approved by the stockholders in May 1943, was to permit the Board of Directors to allot, "with due regard for meritorious service," stock options to key officers and employees as an inducement to those in the employ of the corporation to continue therein and to those absent in war activities to return to the company when their war activities ceased, and to encourage all optionees to strive more diligently for the company's success. On November 30, 1943, the Board of Directors, acting through an authorized committee, granted stock options to eight officers and 39 other employees.[3] The option price of $5.81 was based on the average market price during the preceding 30 consecutive trading days; it was slightly above the market price of November 30, 1943.[4] The options were to run for five years and were exercisable after June 15, 1944 in ten per cent. instalments if the optionee had remained in the company's employ for the preceding six months. Optionees on leave of absence of war service could not exercise their options until after returning to the company's employ. For reasons unnecessary to detail none of the options was exercised before November 26, 1945. On that date, which was shortly after the company had received from the General Counsel of the United States Maritime Commission a letter expressing his opinion that the difference between the option price and the market price at the time of exercising the option would not be regarded as compensation for services within the meaning of section 805(c), the optionees were notified that they were at liberty to exercise their options. Options for 1,100 shares were exercised in 1945, for 44,832 shares in 1946, for 24,066 shares in 1947 and for 18,484 shares in 1948 — a total of 88,482 shares.[5] It was stipulated that if the option profits are treated as compensation, at least 14 of the optionees, seven of whom have appeared as defendants, received annual compensation in excess of $25,000 for one or more of the years 1946 to 1948.
 
 
 5
 Judge Palmieri followed the opinion expressed by the General Counsel for the Maritime Commission. We agree with the plaintiff that the General Counsel's opinion was not an administrative ruling by the Maritime Commission itself and need be followed by the courts only in so far as its reasoning is persuasive.[6] The plaintiff makes a powerful argument against the correctness of the trial court's decision, but it does not convince us. It is true that before exercising his option to take up any part of the optioned shares, the optionee must have worked for the company for a specified period of time; that continuation in the employ of a corporation has been held to be the consideration which validates a stock option,[7] and that for tax purposes exercise of a stock option may give the optionee compensation in the amount of the difference between the option price and the market price of the shares acquired by exercise of the option.[8] But no authority has been cited which construes "compensation" as used in section 805(c) of the Merchant Marine Act to include such so-called "option profits." The meaning of "compensation" as there used is to be determined by the purpose of the statute. That purpose was to develop a strong merchant marine and to compel subsidized corporations to operate on a sound basis and not waste their assets by paying exorbitant salaries. One of the customary ways for a corporate employer to retain a competent personnel was to offer valuable officers and employees "incentive" stock options to induce them to continue to serve and to give them a financial interest in the corporation's success by investment in its stock. We cannot believe that the Congress meant to prohibit this customary method of developing efficient management by limiting the annual "compensation" receivable by such officers and employees. The plaintiff says that the legislative history of section 805(c) shows that one purpose of the statute was to prevent undercapitalization of subsidized operators, and argues that, except for the stock options, the corporation could itself have sold the shares at their market price when the options were exercised. But plainly the statute did not forbid all incentive stock options. Even on the plaintiff's theory the exercise of such an option was unassailable unless it resulted in the optionee receiving in excess of $25,000 per year. We do not believe that the Congress intended by section 805 (c) to discriminate between stock options all of which were unassailable when granted but some of which, if the corporation prospered, through development of an efficient organization, were certain to become assailable under the $25,000 limitation of "compensation," if that were to be applied. In our opinion dismissal of the first alleged cause of action was correct.
 
 
 6
 The second cause of action asserts liability of the defendants to account for tax losses sustained by the corporation and tax advantages gained by the optionees by reason of the corporation's relinquishment of any claim to tax deductions attributable to the stock options. The theory is that each optionee was subject to income tax on the amount of his "option profits" in the year when he exercised his option, and the corporation was entitled to deduct a corresponding amount from its gross income in figuring its own income tax for that year; and that in order to relieve the optionees from their income tax liability, the defendants, "in breach of their fiduciary duties," caused the corporation to exercise and file with the Commissioner of Internal Revenue, its consent not to claim any deductions attributable to the stock options in its own tax returns.
 
 
 7
 On April 12, 1946 the Commissioner of Internal Revenue promulgated a ruling known as I.T. 3795 (1946 — 1 C.B. 15). It dealt with employees' stock options granted before February 26, 1945 (the date of the decision of Commissioner of Internal Revenue v. Smith, 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830), recognized that under tax decisions before the Smith case there might be reasonable doubt as to the compensatory nature of stock options, and provided an expeditous method of obtaining a ruling as to the tax consequences of the exercise of the options. On May 2, 1946 Mr. Franklin, president of the corporation, acting upon the advice of counsel, requested a ruling under I.T. 3795. Counsel had advised that in his opinion the options were non-compensatory, and that the corporation had no right to claim deductions in the amount of the optionee's "profits," and should, in its request for a ruling, offer to file the consents prescribed in I.T. 3795. In response to this request, the acting Commissioner, under date of May 31, 1946, wrote that "* * * no `income' will be realized by your officers and employees upon the exercise or transfer of the options in question provided that such officers and other employees and you as their employer each file, on or before July 1, 1946, the consents required under the provisions of the next to the last paragraph of I.T. 3795."[9] The treasurer of the corporation, Mr. Gibbons, sent a copy of this ruling to the optionees with a request that they execute their consents. Mr. Hicks, vice-president of the corporation, executed the corporation's consent, and all consents were filed with the Commissioner before July 1, 1946.
 
 
 8
 The trial judge was of opinion that in approving the stock option plan the stockholders "must be deemed to have concurred in its tax consequences, whatever they might be, and in all steps that the directors and officers might reasonably take to implement the plan"; and that defendant Hicks' signing of the corporation's consent not to claim a deduction on account of the stock options was "such an act of implementation." We agree that the stockholders approved the tax consequences of the plan, "whatever they might be," but the proxy statements upon which the stockholders acted said not a word about taxes and we cannot agree that the consent signed by Mr. Hicks was a mere "implementation" of the tax consequences of the plan, if the corporation's consent changed the tax consequences, as the plaintiff contends it did. As to this the trial judge assumed that the corporation did have the legal right to deduct the amount of the option profits from its gross income but found the right so doubtful that execution of the corporation's consent was not a breach of fiduciary duty but an act within the discretion of the officers. We address ourselves to this aspect of the case.
 
 
 9
 We are not entirely clear whether the plaintiff charges all the defendants with breach of fiduciary duty or only defendants Franklin and Hicks.[10] The optionees as such were under no fiduciary duty to the corporation. Such tax advantages as the stock options gave them they were entitled to keep. We cannot see that as optionees they owed the corporation a fiduciary duty to refrain from filing their own consents under I.T. 3795 in order to nullify the effect of the consent the company proposed to file. As directors the defendants did owe the corporation fiduciary duties not to waste or give away its assets. But as directors they were not consulted as to waiving the company's right to claim a tax deduction in connection with the exercise of the options. Having taken no part in the waiver, they cannot be charged as directors with giving away a corporate asset. Any claim of liability on the part of the defendants as directors must be predicated on negligence in not preventing the officers of the corporation from filing its consent. As the opinion below points out, the right of the corporation to a tax deduction on account of the stock options was far from clear under prior decisions of the Board of Tax Appeals and the ruling of the Acting Commissioner. It is true that in 1950 the Tax Court construed I.T. 3795 as instructing the Commissioner's staff "that upon the filing of such consents any controversy must automatically be closed in the taxpayer's favor."[11] But the directors are not chargeable with foreseeing this later ruling. As matters stood in 1946, the corporation's right to a tax deduction was very doubtful.[12] We do not think the board of directors can be held liable for negligence in not having prevented the filing of the company's consent.
 
 
 10
 We turn now to the question whether the officers who took part in waiving the corporation's doubtful claim to a tax deduction incurred liability thereby. Certainly the corporation was entitled to submit its tax problems to the Commissioner of Internal Revenue and request a ruling on them. Mr. Franklin, the president, was an appropriate officer to present the request. We do not think he is chargeable with a violation of fiduciary duty in doing so merely because he would personally get tax advantages if the Commissioner ruled one way and the corporation would get them if the Commissioner ruled the other way. A corporate officer's fiduciary duty is violated when he acts on behalf of his corporation in a matter where he has a personal interest which may influence his judgment with respect to the corporation's interests.[13] Here there did not appear to be any conflict between his own interest and the corporation's interest, for counsel, Mr. Fridlund, had advised him that it would be a "fraud on the revenue" for the company to claim a tax deduction. His interest and the corporation's were the same, namely, to get a speedy ruling by the Commissioner; the alternative was to litigate in court a claim which in counsel's opinion was baseless. In our opinion it was within the president's discretion to select the former alternative. The foregoing discussion with respect to Mr. Franklin's request for the ruling applies with equal force to Mr. Hicks' execution of the corporation's consent after the ruling was obtained. He was present when Mr. Fridlund expressed the opinion that the claim was baseless.
 
 
 11
 The appellant contends that Truncale v. Universal Pictures Co., Inc., D.C.S.D. N.Y., 76 F.Supp. 465 is a case "on all fours with this case and does not require discussion." We think a vital distinction exists in the fact that there the defendants, who caused the corporation's consent to be filed with the Commissioner, had not been advised by counsel that the corporation had no right to claim a tax deduction on account of the options. No authority has been found which discusses whether counsel's advice that a cestui has no valid claim — and consequently no interest adverse to the fiduciary's interest — will protect the fiduciary from liability for waiving the claim instead of litigating it. Whether a conflict of interests existed was a question of fact, the answer to which turned on a question of law. Counsel's opinion as to the law (even though erroneous) should, in our opinion, protect the officers acting in reliance upon it.[14] Accordingly dismissal of the second cause of action was correct.
 
 
 12
 The third alleged cause of action is for giving directors, members of their families and servants free transportation or transportation at reduced rates. No statute authorized this practice. Nor can it be defended in our opinion on the ground of custom or of approval by the Maritime Commission and its successor of the Atlantic Conference Agreement to which the United States Lines Company was a party. Perhaps some of the free trips by directors can be justified as a means of educating them regarding the company's business and the operation of its vessels, but this could scarcely be stretched to include members of a director's family or servants, and certainly not when they traveled without the director. As to trips not so justifiable, free or reduced-rate transportation was a gift which the corporate officers were not authorized to make and for which the donees must account.
 
 
 13
 For the foregoing reasons we conclude that the judgment must be reversed as to the third cause of action and the cause remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 "Limitation on wages, salary, or compensation of director, officer, or employee of contractor
 "(c) No director, officer, or employee (which terms shall be construed in the broadest sense to include, but not to be limited to, managing trustee or other administrative agent) shall receive from any contractor, holding a contract authorized by sections 1171-1182 or 1191-1204 of this title and its affiliate, subsidiary, associate, directly or indirectly, wages, salary, allowances of compensation in any form for personal services which will result in such person's receiving a total compensation for his personal services from such sources exceeding in amount or value $25,000 per annum, and no such person or concern shall be qualified to receive or thereafter to hold any contract under this part, if such person or concern, its subsidiary, affiliate, or associate pays or causes to be paid, directly or indirectly, wages, salary, allowances, or compensation in any form for personal services which result in such person's receiving a total compensation for his personal services from such sources exceeding in amount or value $25,000 per annum.
 * * * * *
 "Penalty
 "(f) Any willful violation of any provision of this section shall constitute a breach of the contract or charter in force under this chapter, and upon determining that such a violation has occurred the Commission may forthwith declare such contract or charter rescinded and any person willfully violating the provisions of this section shall be guilty of a misdemeanor."
 
 
 [2]
 Cf. Odell v. Humble Oil & Refining Co., 10 Cir., 201 F.2d 123, 127, certiorari denied 345 U.S. 941, 73 S.Ct. 833, 97 L. Ed. 1367
 
 
 *
 Judge Swan agrees with Judge Lumbard's separate concurring opinion but adheres to his own opinion as an additional ground for affirmance of the district court's dismissal of the first cause of action
 
 
 [3]
 Several of the directors were optionees, but they were not granted options as such. The plan provided: "Directors as such shall not be eligible to receive such options, but officers or other eligible employees who are also directors may be granted such options."
 
 
 [4]
 The plaintiff makes no contention that the granting of the option increased the "compensation" of any officer or employee
 
 
 [5]
 The "option profits" aggregated $1,186,667.49
 
 
 [6]
 Colby v. Klune, 2 Cir., 178 F.2d 872, 875, footnote 15; see also Jewell Ridge Coal Corp. v. Local No. 6157, etc., 325 U.S. 161, 169, 65 S.Ct. 1063, 89 L.Ed. 1534
 
 
 [7]
 See Eliasberg v. Standard Oil Co., 23 N.J.Super. 431, 92 A.2d 862, affirmed 12 N.J. 467, 97 A.2d 437; Gottlieb v. Heyden Chemical Corp., Del., 90 A.2d 660, 664; Id., Del., 92 A.2d 594, 598; Clamitz v. Thatcher Mfg. Co., 2 Cir., 158 F.2d 687, 692, certiorari denied 331 U.S. 825, 67 S.Ct. 1316, 91 L.Ed. 1841; Steinberg v. Sharpe, D.C.S.D.N.Y., 95 F.Supp. 32, 33, affirmed on opinion below, 2 Cir., 190 F.2d 82
 
 
 [8]
 Commissioner of Internal Revenue v. Smith, 324 U.S. 177, 65 S.Ct. 591, 89 L. Ed. 830
 
 
 [9]
 This paragraph reads as follows:
 "Accordingly, in view of the prior development of the regulations an [sic] interpretations relative to employee stock options (see T.D. 3435, (1923) II-1 C.B. 50; I.T. 3204, 1938-2 C.B. 126; T.D. 4879, 1939-1 C.B. 159), as respects an option granted to an employee prior to February 26, 1945, unless at the time such option was granted, there was a substantial difference between the fair market value of the stock and the option price therefor, or, within the purview of section 29.22(a)-1 of Regulations 111 prior to the amendments made by Treasury Decision 5507, supra, the employee would otherwise clearly realize income by way of compensation through the exercise or transfer of the option, this office will hold that the exercise or transfer of such option, as the case may be, does not result in income to the employee by way of compensation under the principles enunciated in the preceding paragraphs, provided, however, that on or before July 1, 1946, the employee to whom such option is granted and any transferee thereof, and the employer corporation or any other taxpayer who granted such option to the employee, file in duplicate with the Commissioner of Internal Revenue at Washington, D. C., written consents (1) agreeing that the basis to the employee, and to any transferee of the option, for the stock acquired or to be acquired pursuant to the option shall be the actual price paid therefor and that no deduction shall at any time be claimed attributable to any aspect of the option arrangement, under section 23(a) (1) or any other subsection of the Internal Revenue Code [26 U.S.C. A.], by the employer corporation or the taxpayer who granted the option, and (2) indemnifying the Commissioner against the filing of a claim for credit or refund, or any other action by any taxpayer concerned, inconsistent with the consents filed."
 
 
 [10]
 Appellant's brief at page 52 says:
 "In May and June 1946 defendants Franklin and Hicks, acting as president and executive vice-president of the Corporation, waived the Corporation's right to claim a tax deduction in connection with the exercise of the options. Both of these men held large amounts of the options. Both stood to derive large personal tax advantages by sacrificing the rights of the Corporation. They sacrificed those rights in order to save their own taxes. They did this without consulting the board of directors, let alone the stockholders of the Corporation. The other defendant optionees joined in this self-serving conduct by filing their consents; each of them was a director, each shifted his tax burden to the Corporation."
 
 
 [11]
 Malcolm S. Clark, 9 T.C.Memo 719, 722
 
 
 [12]
 See the numerous cases cited in Commissioner of Internal Revenue v. Lo Bue, 3 Cir., 223 F.2d 367, certiorari granted 350 U.S. 893, 76 S.Ct. 151
 
 
 [13]
 See Bogert, Trusts and Trustees, § 543:
 "One of the most fundamental duties of the trustee is that he must display throughout the administration of the trust complete loyalty to the interests of the cestui que trust. He must exclude all selfish interest and also all consideration of the welfare of third persons."
 
 
 [14]
 Somewhat analogous is illustration 3 in comment b of § 201, Restatement, Trusts:
 "3. By the terms of a trust the trustee is directed to invest only in first mortgages. He purchases a mortgage, which he believes to be a first mortgage, having obtained the opinion of competent counsel that it was a first mortgage. The opinion of counsel was based upon a decision of the Supreme Court of the State, which was overruled after the trustee made the purchase. The trustee is not liable for breach of trust in making the investment."
 
 
 
 14
 LUMBARD, Circuit Judge (concurring).
 
 
 15
 I would prefer to rest on a different ground in affirming the District Court's dismissal of the first cause of action with respect to the receipt by certain officers of "option profits" alleged to be "compensation" in excess of the $25,000 per year permitted by the Merchant Marine Act.
 
 
 16
 In my opinion, § 805 of the Merchant Marine Act, 46 U.S.C.A. § 1223 did not create a private right of action nor was it meant to be a measure of the obligation of the defendants to the company as a basis for a suit to recover any excess "compensation" paid to any of the defendants. 46 U.S.C.A. § 1223(c) provided (prior to its amendment in 1952):
 
 
 17
 "No director, officer, or employee * * * shall receive from any contractor, holding a contract authorized by sections 1171-1182 or 1191-1204 of this title * * * directly or indirectly, wages, salary, allowances of compensation in any form for personal services which will result in such person's receiving a total compensation for his personal services from such sources exceeding in amount or value $25,000 per annum, and no such person or concern shall be qualified to receive or thereafter to hold any contract under this part, if such person or concern * * * pays or causes to be paid * * * compensation in any form for personal services which result in such person's receiving a total compensation for his personal services from such sources exceeding in amount or value $25,000 per annum." (Emphasis supplied.)
 
 46 U.S.C.A. § 1223(f) provides:
 
 18
 "Any willful violation of any provision of this section shall constitute a breach of the contract or charter in force under this chapter, and upon determining that such a violation has occurred the Commission may forthwith declare such contract or charter rescinded and any person wilfully violating the provisions of this section shall be guilty of a misdemeanor." (Emphasis supplied.)
 
 
 19
 The obvious purpose of these provisions of the Merchant Marine Act was to prevent the granting or continuance of subsidies to companies which paid their officers more than $25,000 per year and to prevent the dissipation of such subsidies. Congress was saying that if a company paid its officers more than $25,000 by way of compensation, the government should not subsidize its operations in any way. The purpose clearly was to protect the federal treasury and to limit the expenditure of federal monies; the purpose was not to protect any private company or the stockholders of it, directly or indirectly. The inconsistency in finding that such protection of the corporation was intended becomes apparent when we note that if the stockholders prevail in this action they provide a basis upon which the Maritime Commission may rescind the Company's charter to the detriment of both the corporation and its stockholders. The statutory scheme is clearly ill adapted to the creation of a private right. Companies eligible for subsidies under the Act could choose whether or not to apply for contracts under the Act. If they were granted subsidies they would forfeit them if they paid out more than $25,000 in compensation and in addition they would be ineligible for further subsidies at another time. More than that, if any company that was subsidized wilfully violated this provision of the law those responsible could be prosecuted for committing a misdemeanor.
 
 
 20
 In the case now before us the stock options were exercised only after receipt of an opinion from the General Counsel of the Maritime Commission that such exercise would not result in unlawful compensation. Under these circumstances it would be difficult to conclude that the giving or receipt of the compensation was a "wilful" violation of 46 U.S.C.A. § 1223(c). "Wilful" is a word of many meanings, influenced by its context, Spies v. United States, 1943, 317 U.S. 492, 497, 63 S.Ct. 364, 87 L.Ed. 418, but in the context of this statute I think it does not include an act which a representative of the appropriate regulatory agency stamps with his approval, especially when appellate judges can differ as to whether the stock options are "compensation." Cf. United States v. Murdock, 1933, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381; United States v. Martell, 3 Cir., 1952, 199 F.2d 670, certiorari denied, 1952, 345 U.S. 917, 73 S.Ct. 728, 97 L.Ed. 1350.
 
 
 21
 It is true that not all of the defendants saw the letter from the General Counsel or relied on it specifically. The evidence shows that Gibbons and Harris did see it and that Franklin and Hicks, by their own testimony, did not. There appears to be nothing in the record to show whether the other defendants saw it or not. I am convinced, however, that the plaintiff failed to show that any of the defendants acted wilfully. By a letter of June 13, 1944, Gibbons, the corporation's Treasurer, requested all of the optionees to refrain from exercising the options because of advice of counsel that approval should be obtained from the Salary Stabilization Unit of the Bureau of Internal Revenue. By a memorandum dated September 1, 1944, Mr. Fridland, the corporation's counsel, pointed out to Mr. Gibbons that it was "essential that the stock options be held exempt from salary stabilization as not constituting `additional compensation.' Otherwise, we will run afoul of the $25,000 salary limitation imposed by Section 803(c) of the Merchant Marine Act." Exception from salary stabilization could not be obtained, so the corporation waited until after the repeal of salary stabilization and then Harris, the President of the corporation, by a letter dated October 22, 1945, applied to the General Counsel of the Maritime Commission for a ruling on the options. After receipt of the General Counsel's favorable ruling of November 19, Harris sent a memorandum to all the optionees on November 26, 1945 reading in part as follows:
 
 
 22
 "It gives me great pleasure to inform you that the conditions which led to the Company's request on June 13, 1944 that you refrain from exercising any part of your option to purchase Common Stock of the Company, have now been cleared. Options may, therefore, be exercised * * *"
 
 
 23
 All of this indicates that the optionees relied on the corporation to clear the options with the appropriate authorities and to make sure of their legality. Thus there was testimony that the directors were familiar with the salary limitations of the Merchant Marine Act. Franklin testified that he was cognizant of the fact that the exercise of the options had to be consistent with the Merchant Marine Act "or else our whole subsidy position might be jeopardized." He testified further that "it is our practice in the company to make sure that nothing we do is incompatible with the 1936 Act." Gibbons testified that the Memorandum of November 26, 1945 was sent to all the optionees, and the plaintiff concedes that none of the options were exercised until after that date. Since the optionees relied on the corporation to check the legality of the options, and since the corporation obtained a favorable ruling from the Maritime Commission's General Counsel before informing the optionees that they were free to exercise them, I think that the optionees, even if they received excess compensation prohibited by the Act, did not do so wilfully. Certainly there is no evidence that they knowingly violated the Act or that they acted with a careless disregard for its requirements.
 
 
 24
 If the violations were not wilful the sanctions provided by § 1223(f) do not apply. Thus the only applicable sanction would be that provided in § 1223(c) itself: "no such person or concern shall be qualified to receive or thereafter to hold any contract under this part." If the acts of the defendants were not wilful they were not guilty of any criminal violation.
 
 
 25
 It is also significant that § 1223(c) did not declare the receipt of prohibited compensation to be "unlawful." This is in sharp contrast to § 1223(a), (d), and (e) which provide that certain prohibited acts are "unlawful." Violations of these subsections are misdemeanors whether they are wilful or not, by virtue of 46 U.S.C.A. §§ 1223(a) and 1228. This distinction strongly indicates that no general declaration of unlawfulness was intended with respect to the compensation prohibited by § 1223(c).
 
 
 26
 The authorities cited by our dissenting colleague are not in point, it seems to me, because in those cases there was good reason to believe, and this court found, that Congress was enacting legislation for the benefit of a class. The court therefore concluded that the right of a member of the protected class to bring a civil suit should flow from the legislation. A clear case of this is our recent decision in Fitzgerald v. Pan American World Airways, Inc., 2 Cir., 229 F.2d 499. We were there concerned with 49 U.S. C.A. § 484(b) which protects against unjust discrimination by air carriers. The plaintiffs were persons allegedly harmed by unjust discrimination and were clearly within a class which Congress sought to protect. In Reitmeister v. Reitmeister, 2 Cir., 1947, 162 F.2d 691, 694; Fischman v. Raytheon Manufacturing Co., 2 Cir., 1951, 188 F.2d 783; and Goldstein v. Groesbeck, 2 Cir., 1944, 142 F.2d 422, 154 A.L.R. 1285, certiorari denied, 1944, 323 U.S. 737, 65 S.Ct. 36, 89 L.Ed. 590, we were concerned respectively with persons harmed by disclosure of communications in violation of the communications Act, 47 U.S.C.A. § 605; persons defrauded in contravention of the Securities Act of 1934, 15 U.S.C.A. § 78j(b); and a subsidiary corporation harmed by a contract made with an unregistered holding company in violation of 15 U.S.C.A. § 79d(a) (2). In each case the plaintiff was clearly within a class intended to be protected by the statute and we relied on that fact in holding that a private right of action existed. Moreover in the Goldstein case the statute specifically declared the contract void, 15 U.S.C.A. § 79z(b), and this was a further basis for implying the existence of civil rights of action. Restatement of Torts § 286, upon which Judge FRANK also relies, specifically recognizes that in order to create a private right of action it must be the intent of the enactment "exclusively or in part to protect an interest of the [plaintiff]." See also Restatement of Torts § 288(a); Downing v. Howard, 3 Cir., 1947, 162 F.2d 654, 657-658, certiorari denied 332 U.S. 818, 68 S.Ct. 155, 92 L.Ed. 395. Since the statute we are here considering was not intended or designed to protect the plaintiff's interest, there is no civil right of action.
 
 
 27
 Moreover in each of the cases relied on by Judge FRANK we assumed that the conduct complained of constituted a criminal violation. The Restatement takes the view that "If the statute or ordinance is one which makes an makes an act or failure to act a criminal offense but which makes no provision for civil liability, a particular act or omission does not create civil liability unless it is of such a character or done under such circumstances as to make it criminally punishable." Restatement of Torts § 286, Comment C. Since the acts here are only criminal if they were "wilfully" performed and it is doubtful that there was any wilfulness, there should be neither criminal nor civil responsibility.[1]
 
 
 28
 Thus I would conclude that Congress intended these provisions of the Merchant Marine Act to be administered by the Maritime Board and that no private right of action by the corporation or on its behalf was created with respect to any violation of the provisions regarding compensation. If that is the case we need not and should not proceed to a determination of whether the proceeds of these stock options were "compensation" within the meaning of the Act. That is a determination primarily for the Board. If, however, such a determination is appropriate in this proceeding, I agree with Judge SWAN that the profits realized did not constitute "compensation."
 
 
 29
 I concur in Judge SWAN'S opinion insofar as it relates to the second and third causes of action.
 
 
 
 Notes:
 
 
 [1]
 The corporation is, of course, not without remedies to protect itself from wrongful action by its officers. The question here is merely whether this corporation, because it is subject to the Merchant Marine Act, has another remedy not available to other corporations and may hold its officers to a stricter standard. If its officers have given salaries, bonuses, stock options, or any other benefits in such aggregate that they amount to a waste of corporate assets in relation to the services rendered to the corporation, then of course the corporation, or the stockholders on its behalf, always have their remedy. However we are not here concerned with any alleged waste of corporate assets in the sense that the enrichments were excessive, except insofar as it is claimed that there was a violation of the Merchant Marine Act
 
 
 
 30
 FRANK, Circuit Judge (dissenting in part).
 
 
 31
 I concur in the reversal as to the third cause of action. I dissent as to the two others.
 
 
 I. The first cause of action
 
 
 32
 1. By exercising the stock options, the officers received large profits, in excess, as to each, of $25,000 a year. The aggregate of such profits was more than a million dollars. In other words, these officers together received that large sum which the company could have obtained and retained for itself as capital, if it had issued the stock at the market price prevailing when the optionees exercised these options. My colleagues hold that, nevertheless, there was no violation of section 805(c) which forbids the receipt of annual compensation by a director or an officer, "directly or indirectly," and "in any form", exceeding "in amount or value" $25,000.
 
 
 33
 The trial judge rested his decision dismissing the first cause of action, and the defendants justify this decision, on the basis that the stock under option had been previously unissued. My colleagues and I agree that this basis is wholly unsound. Judge SWAN rests affirmance on a basis not suggested by the trial judge or the defendants, namely, that the stock options were granted as incentive bonuses.[1] I think this basis equally unsound.
 
 
 34
 Suppose, the company, in a particular year, had paid one of its officers, with an annual salary of $25,000, an additional cash bonus of $5,000, as an incentive. No one could doubt that such a payment would violate the statute: Since Congress plainly prohibited any annual salary in excess of $25,000, it is not arguable that Congress intended to except an incentive cash bonus merely because it was customary for other corporations to use what Judge SWAN calls this "method of developing efficient management."
 
 
 35
 Judge SWAN, however, says that Congress must have intended to except such an incentive bonus if paid, not in money, but in money's worth, in the form of a stock option. I cannot agree. Surely there would have been a violation if the company had paid a $5,000 bonus by deeding the officer land worth (i. e., readily saleable for) $5,000. The result would be the same if it gave the officer an option (which he exercised) to buy for $10,000 some land worth (i. e., readily saleable for) $15,000, or if the officer's bonus consisted of an option (which he exercised) to purchase from the company for $10,000 some stock of another company with a market value of $15,000. I cannot understand why it should make a difference that here the options were to "purchase" some of the company's own stock at a price far below its market value. For obviously, it would be a violation of the Act, if the company "sold" some of its own unissued stock and used some of the cash proceeds to pay the officers a cash bonus.[2]
 
 
 36
 In short, I think Congress, by prohibiting the receipt, "in amount or value", of more than $25,000 a year "in any form", whether "directly or indirectly," did intend that an officer should receive no more than that amount whether the excess be given as an incentive bonus or otherwise, and no matter whether the bonus be in money or in money's worth. Judge SWAN, I think, disregards the Congressional purpose. The very fact that grants of incentive bonuses were well known to Congress, when the statute was enacted, renders it most significant that Congress did not create any exception for such bonuses when it set a $25,000 limit on an officer's annual compensation.
 
 
 37
 In truth, the legislative history reveals that Congress meant section 805(c) to prohibit bonuses: That subsection received its final form through an amendment introduced on the Senate floor by Senator Black. Explaining the amendment, he said that it was "absolutely essential that the amount of salary or bonus drawn by any officials of the subsidized companies should be limited" and that the "limitation should be absolute and not capable of evasion."[3]
 
 
 38
 2. I think the prohibition in section 805(c) and the criminal provision of the statute — section 805(f) — created a civil right in the company to recover from the wrong-doing officers. It has often been held that such a provision does, by implication, create such a civil right, for the vindication of which a civil action may be maintained by a person harmed by the violation. See, e. g., Reitmeister v. Reitmeister, 2 Cir., 162 F.2d 691, 694; Fischman v. Raytheon Manufacturing Co., 2 Cir., 188 F.2d 783, 787; Goldstein v. Groesbeck, 2 Cir., 142 F.2d 422, 154 A.L.R. 1285; Fitzgerald v. Pan American World Airways, Inc., 2 Cir., 229 F.2d 499; Restatement of Torts, Section 286; Morris, The Relation of Criminal Statutes to Tort Liability, 46 Harv.L.Rev. (1933) 453; Lowndes, Civil Liability Created by Criminal Legislation, 16 Minn.L.Rev. (1932) 361.
 
 
 39
 Judge LUMBARD attempts to distinguish the cited cases as follows: In each of them, he says, the criminal provision in question was intended exclusively, or "in part," to protect a class of which the plaintiff was a member, and (says Judge LUMBARD) that is not true here. He reasons that the purpose of the criminal section here was to protect the federal treasury. That argument assumes that this Congressional purpose could be effectively achieved solely by a criminal prosecution of the offended company officers and/or the Commission's cancellation of the company's charter. This assumption ignores the lack of any authority in the Commission to sue the wrong-doing officers to compel them to repay the unlawful excess compensation. Because of that lack, obviously a civil action on the company's behalf to compel such repayment adds a most effective sanction; we stressed a similar factor when, implying a civil right, we sustained a civil action in Goldstein v. Groesbeck, 2 Cir., 142 F.2d 422, 427; See also Fitzgerald v. Pan American World Airways, Inc., supra. I find it difficult to comprehend why Judge LUMBARD assumes that Congress did not have in mind the fact that violations would harm the company as well as the federal treasury, and that recovery by the company would protect not only the federal treasury but also the company and its innocent stockholders. Since Congress must have had that fact in mind, I think we must conclude that it intended, in part, to protect the company and such stockholders. "In part" is enough: it is not necessary that the protection of the company be the primary or chief purpose. See Fairport, P. & E. R. Co. v. Meredith, 292 U.S. 589, 596-597, 54 S.Ct. 826, 78 L.Ed. 1446; Remar v. Clayton Securities Corp., D.C., 81 F. Supp. 1014, 1017. If the primary purpose was protection of the federal treasury from squandering the assets of a subsidized company through excessive salaries, will not that purpose be admirably served if, when the squandering has occurred, it can be undone by a suit on the company's behalf to compel the return of the excessive salary payments?
 
 
 40
 So I note again that, as the Commission has no authority to take steps to compel restoration of the illegal compensation, the result would be, if Judge LUMBARD were correct, i. e. if the company (directly or derivatively) could not sue to recover, that the illegal compensation — here more than $1,000,000 — would remain in the hands of the wrong-doing corporate officers. Criminal punishment could not force them to disgorge.[4] The Commission, if it should learn of the violation, might well, as in the instant case, be reluctant to cancel the company's charter, since a cancellation would most seriously damage the innocent stockholders.
 
 
 41
 3. Judge LUMBARD asserts that Congress could not have intended to permit a civil action on the company's behalf (for the recovery of the illegal compensation) because the resultant disclosure might lead the Commission, under sec. 805(f) to rescind the charter, thus doing the innocent stockholders far more harm than that done by the wrongdoing corporate officers. That is a curious suggestion: it amounts to saying that the statute coerces the stockholders into submitting in silence to the violations, that the stockholders must join in a conspiracy to conceal the violations from the Commission. Moreover, the Commission is not required to rescind; for Section 805(f) provides that the Commission "may" — not "must" or "shall" — rescind on account of a violation.
 
 
 42
 4. I think there is even more justification for interpreting the criminal provision here to allow a civil action than in many of the other cases I cited above. For consider the history of Section 805 (c): The enactment of the Merchant Marine Act of 1936 was initiated by a message from the President, on March 4, 1935, accompanied by a report of the Postmaster General.[5] These documents disclosed that, before this new legislation, the government had granted Merchant Marine operators disguised subsidies in the form of low-interest loans and ocean-mail contracts yielding large profits to the operators; this system had resulted in "practices and abuses which should and must be ended. Some of these have to do with * * * the payment of excess salaries * * * and other abuses which have made for poor management, improper use of profits and scattered efforts." Investigation had shown that comparatively little of the enormous grants had gone into the building of a permanent Merchant Marine on a sound basis. Many of the companies were in a very unsound condition; they were "organized with insufficient paid-in capital"; "startling undercapitalization" had precluded "even an appreciable replacement program." The Reports of the Congressional Committees stated that the new Act was being enacted to meet the President's recommendation and to eliminate the abuses to which he had called attention. I note once more the remarks of Senator Black, quoted above, concerning "evasion" of Section 805(c).
 
 
 43
 In the light of this history, I think Congress intended, by every means, to prevent the depletion of the assets of these heavily subsidized companies through payments of excessive salaries. I see no reason for differentiating the interpretation of Section 805(c) and (f) from the interpretation of other statutes, in the cases cited above, so as to treat violators of Section 805(c) with unusual tenderness. To read this statute as denying a subsidized company a right of action against the violating officers would contribute to the dissipation of the federal subsidies and thus, in considerable measure, frustrate the Congressional aim. I cannot believe Congress meant that persons like the defendants here, in control of such a company, can illegally pay themselves compensation in violation of the statute and yet be able to retain it. But that is Judge LUMBARD's position.
 
 
 44
 5. Judge LUMBARD advances an additional argument for exculpating these defendants: He says (correctly) that Section 805(f) renders the forbidden receipt of excess compensation a crime, only if the violation is "wilful"; and he reasons that the officers were not guilty of "wilful" violations, because of a letter, dated November 19, 1945, from Skinner, the Commission's General Counsel, to Harris, the president of the company, saying that the receipt of the profits derived from exercising the options was lawful merely because the stock was unissued. But aside from the fact that such a letter could not bind the Commission — Colby v. Klune, 2 Cir., 178 F.2d 872, 875 note 15 — there is no evidence whatever that any of the defendants — except two defendants, Harris and Gibbons — knew of that letter before he exercised his options. Indeed, the evidence shows the contrary. Absent knowledge of the letter, patently there could be no reliance on it.
 
 
 45
 Judge LUMBARD concedes that, except as to Harris and Gibbons, there is no proof of reliance by any of the optionees on that letter of November 19, 1945, from Skinner, the Commission's General Counsel, to Harris. But Judge LUMBARD endeavors to show lack of wilfulness in this way: (a) On June 13, 1944, Gibbons, the company's treasurer, sent a letter to each of the optionees reading in part as follows:
 
 
 46
 "Counsel has stated that before such options are exercised, it is advisable that the company obtain the approval of the Salary Stabilization Unit of the Bureau of Internal Revenue of the U. S. Treasury Department. Application for such approval has been made but approval has not yet been received. The company requests, therefore, that you refrain from exercising any part of your option to purchase this Common Stock until you are further advised by the company."
 
 
 47
 (b) On November 26, 1945, Harris, the company's then president (who is not a lawyer) wrote a letter to each of the optionees reading in part as follows:
 
 
 48
 "It gives me pleasure to inform you that the conditions, which led to the company's request on June 13, 1944 that you refrain from exercising any part of your option to purchase Common Stock of the company, have now been cleared. Options may, therefore be exercised in accordance with the terms outlined in the resolution of the Board of Directors of the Company adopted November 30, 1943."
 
 
 49
 Judge LUMBARD seems to reason that, because this November 26, 1945 letter was sent to the optionees a week after Harris received the November 19 letter from the Commission's General Counsel, the optionees should somehow be deemed to have relied on the November 19 letter. I cannot agree. The November 25, 1945 letter from Harris unmistakably referred back solely to Gibbons' letter of June 13, 1944. It thus told the optionees no more than that there no longer existed the obstacle, created by the Stabilization regulations, to the exercise of the options. It did not mention the Merchant Marine Act and therefore did not tell the optionees that in exercising the options they would not violate Section 805(c) of that Act. It is in the light of these facts that we must decide whether those optionees acted "wilfully."
 
 
 50
 The Supreme Court has said that the meaning of "wilful" in a criminal statute must be determined from its context. In cases relative to provisions of the Revenue Act, that Court has held that "wilful" denotes an "evil motive" or "bad intent." So in United States v. Murdock, 290 U.S. 389, 394, 54 S.Ct. 223, 78 L.Ed. 381, the defendant was indicted for "wilfully" refusing to give information to a revenue agent concerning his income tax returns. He had refused on the ground that his answer would incriminate him under state law. Since it was not until it had passed on his case in a prior decision that the Supreme Court definitely established that this was not a sufficient reason for refusing to answer questions of the revenue agents, the Court held that defendant was entitled to have the jury instructed that, if defendant acted in good faith in refusing to answer, he could not be held to have "wilfully" violated the statute. In Spies v. United States, 317 U.S. 492, 497-498, 63 S.Ct. 364, 87 L.Ed. 418, defendant was charged with a wilful attempt to evade or defeat payment of income taxes. Defendant claimed that his failure to file a return and to pay his taxes was not wilful because illness prevented his doing so; the Supreme Court held that defendant was entitled to have the jury instructed that the government must show more than merely voluntary conduct on defendant's part to establish that he wilfully attempted to evade payment.
 
 
 51
 In the context of Section 805(f), I agree that "wilful" requires proof of more than mere voluntary acceptance of compensation in excess of $25,000. But I think that it does not require proof of an "evil motive" or "bad intent." The considerations which demand such proof in the area of tax evasions are not, I think, present here.
 
 
 52
 The Supreme Court in Murdock specified four other possible meanings of "wilful," i. e. (1) no justifiable excuse, (2) stubborn, obstinate and perverse conduct, (3) doing the act without ground for believing it lawful, (4) or conduct marked by careless disregard whether or not one has the right to so act. I think that, construing "wilful" as used in Section 805(f) to mean "without justifiable excuse" would best carry out the intent of Congress and, at the same time, give adequate protection to those accused of violating Section 805(c).
 
 
 53
 The defense of "justifiable excuse" is akin to the defense of a mistake of law due to reliance on the advice of counsel. Generally, such a defense is rejected.[6] However, where, as here, specific intent or "wilful" intent is an element of the offense, the good faith reliance on the erroneous advice of counsel, to whom the defendant has revealed all the pertinent facts, does constitute a valid defense.[7] It would be extending the "advice of counsel" exception to an unprecedented degree to apply it to a situation like this, where these defendants neither consulted counsel, nor received any advice whatever, relating to the statute they are accused of violating.
 
 
 54
 The facts disclose no justifiable excuse. For these defendants were experienced business men, doubtless accustomed to consult counsel frequently. They did not do so before they exercised these options. Furthermore, as already noted, the advice they received from laymen did not relate to the statute which made their conduct unlawful.
 
 
 55
 The situation of Harris and Gibbons is different: They saw the letter from the Commission's General Counsel. If, relying on that advice from such a government lawyer, they believed in good faith they were not violating Section 805(c), they would have had a "justifiable excuse," and therefore plaintiff could not recover from them. However, the issue of their good faith presents a question of fact to be answered by the trial court.[8] Accordingly, I would, but solely as to Harris and Gibbons, remand to the district court for a new trial on this one issue.
 
 
 56
 As to the other optionees, I would reverse the judgment dismissing the first cause of action and direct the entry of judgment for plaintiff.
 
 
 II. The second cause of action
 
 
 57
 1. By causing the company to waive its claim to a tax deduction, Franklin and Hicks obtained for themselves, and for the other defendants, a considerable saving in taxes at a cost to the company of the additional taxes it paid because it did not deduct some $1,200,000. I think that there was a direct conflict between their duties as fiduciaries and this conduct, and that therefore Franklin and Hicks breached their fiduciary obligations. See, e. g. Judge Rifkind's opinion in Truncale v. Universal Pictures Co., Inc., D.C., 76 F.Supp. 465. I think my colleagues mistakenly distinguish that case on the ground that here these fiduciaries had the advice of the company's counsel (who, be it noted, was a law partner of one of the defendants).
 
 
 58
 My colleagues cite an illustration of a trustee acting on advice of counsel, from Restatement of Trusts, Section 201, comment b. But that comment explicitly states that it relates solely to the liability of a trustee for negligence and does not apply when the trustee gains a personal advantage. On the other hand, the Restatement, Section 170, deals separately with the trustee's duty of loyalty, when he acts for his own profit at the expense of the beneficiaries. My colleagues cite no cases (and I cannot believe there are any) in which a trustee, guilty of such a breach of his duty of loyalty, has been exculpated from civil liability because he relied on a lawyer's advice, or in any other way acted believing erroneously that he had a right to do what he did.[9] In such circumstances, his good faith is irrelevant. See Restatement of Trusts, Section 170, comment h. A lawyer's advice, or any other manifestation of good faith, can no more protect the trustee from civil liability than it would one who converted another's property.
 
 
 59
 2. Each of the other directors who were optionees also participated in giving away corporate assets for his own benefit. I think their misconduct cannot be characterized as merely negligent. Therefore, they too are liable for their breaches of the duty of loyalty. Again, their good faith has no relevance. Cf. Mosser v. Darrow, 341 U.S. 267, 275, 71 S.Ct. 680, 95 L.Ed. 927.[10] Accordingly, I would reverse as to the second cause of action.
 
 
 
 Notes:
 
 
 [1]
 Judge LUMBARD agrees with Judge SWAN but adds another reason for affirmance with which Judge SWAN agrees and which I shall discussinfra.
 
 
 [2]
 Literally, a company does not "sell" its own unissued stock. But all members of the court agree that, in this context, there exists no distinction between unissued and "treasury" stock
 
 
 [3]
 Cong.Rec. p. 9911, 74th Cong., 2d Sess
 
 
 [4]
 If the government does not discover the crime within the short three year period set by the statute of limitations, the corporate officers will be free of criminal liability. See 18 U.S.C. § 3282
 
 
 [5]
 H.Doc.No.118, 74th Cong., 1st Sess
 
 
 [6]
 Hall, General Principles of Criminal Law (1947), 358; United States v. Phillips, 7 Cir., 217 F.2d 435; C. I. T. Corp. v. United States, 9 Cir., 150 F.2d 85, 95; Miller v. United States, 4 Cir., 277 F. 721, 726; United States v. McMillan, D. C., 114 F.Supp. 638, 642; Shushan v. United States, 5 Cir., 117 F.2d 110, 133 A.L.R. 1055
 
 
 [7]
 Williamson v. United States, 207 U.S. 425, 453, 28 S.Ct. 163, 52 L.Ed. 278; Townsend v. United States, 68 App.D.C. 223, 95 F.2d 352, 358-359; United States v. Phillips, supra; C. I. T. Corp. v. United States, supra; Miller v. United States, supra; United States v. McMillan, supra. Hall, The Substantive Law of Crimes — 1887-1936, 50 Harvard Law Review, 616, 642-647 (1937)
 
 
 [8]
 Spies v. United States, 317 U.S. 492, 500, 63 S.Ct. 364, 87 L.Ed. 418; United States v. Murdock, 290 U.S. 389, 54 S. Ct. 223, 78 L.Ed. 381; C. I. T. Corp. v. United States, 9 Cir., 150 F.2d 85, 89
 
 
 [9]
 The cases cited by defendants, dealing with good faith as a defense available to directors, all relate to situations where the directors had not themselves benefited from their conduct. See, e. g., Lynch v. Sapiro, 117 N.J.Eq. 485, 176 A. 327; Smith v. Banister, 127 N.J.Eq. 385, 13 A.2d 485; Madsen v. Burns Bros., 108 N. J.Eq. 275, 155 A. 28; Ellerman v. Chicago Junction Railways & Union Stockyards Co., 49 N.J.Eq. 217, 23 A. 287; Simon v. Socony-Vacuum Oil Co., 179 Misc. 202, 38 N.Y.S.2d 270, affirmed 267 App.Div. 890, 47 N.Y.S.2d 589; Hayman v. Morris, Sup., 36 N.Y.S.2d 756
 Defendants strangely cite Medford Trust Co. v. McKnight, 292 Mass. 1, where at page 31, 197 N.E. 649, a director was held liable for self-dealing.
 
 
 [10]
 Bogert says:
 "* * * acts by a fiduciary which are to his private advantage and are done during the administration of the trust without direct dealing with the cestui * * * are always breaches of the fiduciary's duty of loyalty to the principal, and any advantages gained by the fiduciary may always be taken from him, by way of constructive trust or otherwise. Fullness of disclosure, honesty of intentions, the payment of adequate price, lack of damage to the cestui, are in no case excuses. The cestui may attack the transaction which was a breach of the duty of loyalty. Putting it another way, the presumption of its fraudulent character is irrebuttable." 3 Bogert, Trusts and Trustees, p. 161 (1946).
 "This duty * * * applies to * * * a corporate officer or promoter and corporation * * *" Id., at 165-166.